# PENRY *v.* JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION

No. 00–6677. Argued March 27, 2001—Decided June 4, 2001

784

*Robert S. Smith* argued the cause for petitioner. With him on the briefs were *Julia Tarver* and *John E. Wright.*

*Andy Taylor*, First Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *John Cornyn*, Attorney General, *Gregory S. Coleman*, Solicitor General, *Michael T. McCaul*, Deputy Attorney General, *Edward L. Marshall*, Senior Assistant Attorney General, and *Gena Blount Bunn* and *Tommy L. Skaggs*, Assistant Attorneys General.

*Gene C. Schaerr* argued the cause for the State of Alabama as *amicus curiae* urging affirmance. With him on the brief were *Bill Pryor*, Attorney General, *J. Clayton Crenshaw*, Assistant Attorney General, *Carter G. Phillips*, and *Rebecca K. Smith.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Association on Mental Retardation et al. by *James W. Ellis, Michael B. Browde, Jeffrey J. Pokorak,* and *Stanley S. Herr*; and for the National Association of Criminal Defense Lawyers by *Edward M. Chikofsky, Lisa B. Kemler, John H. Pickering,* and *Christopher J. Herrling.*

Briefs of *amici curiae* urging affirmance were filed for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson*; and for Justice for All by *Patrick F. Philbin.*

*Richard Wilson* and *William J. Edwards* filed a brief for the International Association for the Scientific Study of Intellectual Disabilities et al. as *amici curiae.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In 1989, we held that Johnny Paul Penry had been sentenced to death in violation of the Eighth Amendment because his jury had not been adequately instructed with respect to mitigating evidence. See *Penry* v. *Lynaugh*, 492 U. S. 302 (1989) *(Penry I)*. The State of Texas retried Penry in 1990, and that jury also found him guilty of capital murder and sentenced him to death. We now consider whether the jury instructions at Penry's resentencing complied with our mandate in *Penry I*. We also consider whether the admission into evidence of statements from a psychiatric report based on an uncounseled interview with Penry ran afoul of the Fifth Amendment.

I

Johnny Paul Penry brutally raped and murdered Pamela Carpenter on October 25, 1979. In 1980, a Texas jury found him guilty of capital murder. At the close of the penalty hearing, the jury was instructed to answer three statutorily mandated "special issues":

" '(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

" '(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

" '(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.' "
*Id.*, at 310 (quoting Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981 and Supp. 1989)).

The jury answered "yes" to each issue and, as required by statute, the trial court sentenced Penry to death. 492 U. S., at 310–311.

Although Penry had offered extensive evidence that he was mentally retarded and had been severely abused as a child, the jury was never instructed that it could consider and give mitigating effect to that evidence in imposing sentence. *Id.*, at 320. Nor was any of the three special issues broad enough in scope that the jury could consider and give effect to the mitigating evidence in answering the special issue. *Id.*, at 322–325. While Penry's mental retardation was potentially relevant to the first special issue—whether he had acted deliberately—we found no way to be sure that the jurors fully considered the mitigating evidence as it bore on the broader question of Penry's moral culpability. *Id.*, at 322–323. As to the second issue—whether Penry would be a future danger—the evidence of his mental retardation and history of abuse was "relevant only as an *aggravating* factor." *Id.*, at 323 (emphasis in original). And the evidence was simply not relevant in a mitigating way to the third issue—whether Penry had unreasonably responded to any provocation. *Id.*, at 324–325.

The comments of counsel also failed to clarify the jury's role. Defense counsel had urged the jurors to vote "no" on one of the special issues if they believed that Penry, because of the mitigating evidence, did not deserve to be put to death. The prosecutor, however, had reminded them of their "oath to follow the law and . . . answe[r] these questions based on the evidence and following the law." *Id.*, at 325 (internal quotation marks omitted).

"In light of the prosecutor's argument, and . . . in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty," we concluded that "a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.*, at 326,

328. We thus vacated Penry's sentence, confirming that in a capital case, "[t]he sentencer must . . . be able to consider and give effect to [mitigating] evidence in imposing sentence," so that "'the sentence imposed . . . reflec[ts] a reasoned *moral* response to the defendant's background, character, and crime.'" *Id.*, at 319 (quoting *California* v. *Brown*, 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring) (emphasis in original)).

Penry was retried in 1990 and again found guilty of capital murder. During the penalty phase, the defense again put on extensive evidence regarding Penry's mental impairments and childhood abuse. One defense witness on the subject of Penry's mental impairments was Dr. Randall Price, a clinical neuropsychologist. On direct examination, Dr. Price testified that he believed Penry suffered from organic brain impairment and mental retardation. App. 276–279; 878. In the course of cross-examining Dr. Price, the prosecutor asked what records Price had reviewed in preparing his testimony. Price cited 14 reports, including a psychiatric evaluation of Penry prepared by Dr. Felix Peebles on May 19, 1977. *Id.*, at 327. The Peebles report had been prepared at the request of Penry's then-counsel to determine Penry's competency to stand trial on a 1977 rape charge—unrelated to the rape and murder of Pamela Carpenter. *Id.*, at 55–60, 125. The prosecutor asked Dr. Price to read a specific portion of the Peebles report for the jury. Over the objection of defense counsel, Dr. Price recited that it was Dr. Peebles' "professional opinion that if Johnny Paul Penry were released from custody, that he would be dangerous to other persons." *Id.*, at 413. The prosecutor again recited this portion of the Peebles report during his closing argument. *Id.*, at 668.

When it came time to submit the case to the jury,[2] the court instructed the jury to determine Penry's sentence by answering three special issues—the same three issues that

had been put before the jury in *Penry I.* Specifically, the jury had to determine whether Penry acted deliberately when he killed Pamela Carpenter; whether there was a probability that Penry would be dangerous in the future; and whether Penry acted unreasonably in response to provocation. App. 676–678. Cf. *Penry I,* 492 U. S., at 320.

The court told the jury how to determine its answers to those issues:

> "[B]efore any issue may be answered 'Yes,' all jurors must be convinced by the evidence beyond a reasonable doubt that the answer to such issue should be 'Yes.' . . . [I]f any juror, after considering the evidence and these instructions, has a reasonable doubt as to whether the answer to a Special Issue should be answered 'Yes,' then such juror should vote 'No' to that Special Issue." App. 672–673.

The court explained the consequences of the jury's decision:

> "[I]f you return an affirmative finding on each of the special issues submitted to you, the court shall sentence the defendant to death. You are further instructed that if you return a negative finding on any special issue submitted to you, the court shall sentence the defendant to the Texas Department of Corrections for life. You are therefore instructed that your answers to the special issues, which determine the punishment to be assessed the defendant by the court, should be reflective of your finding as to the personal culpability of the defendant, JOHNNY PAUL PENRY, in this case." *Id.,* at 674–675.

The court then gave the following "supplemental instruction":

> "You are instructed that when you deliberate on the questions posed in the special issues, you are to consider

mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues." *Id.,* at 675.

A complete copy of the instructions was attached to the verdict form, and the jury took the entire packet into the deliberation room. Tr. of Oral Arg. 31. The verdict form itself, however, contained only the text of the three special issues, and gave the jury two choices with respect to each special issue: "We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is 'Yes,'" or "We, the jury, because at least ten (10) jurors have a reasonable doubt as to the matter inquired about in this Special Issue, find and determine that the answer to this Special Issue is 'No.'" App. 676–678.

After deliberating for approximately 2½ hours, the jury returned its punishment verdict. See 51 Record 1948, 1950. The signed verdict form confirmed that the jury had unanimously agreed that the answer to each special issue was "yes." App. 676–678. In accordance with state law, the court sentenced Penry to death.

The Texas Court of Criminal Appeals affirmed Penry's conviction and sentence. The court rejected Penry's claim that the admission of language from the 1977 Peebles report violated Penry's Fifth Amendment privilege against self-incrimination. The court reasoned that because Dr. Peebles had examined Penry two years prior to the murder of Pamela Carpenter, Penry had not at that time been "confronted with someone who was essentially an agent for the State whose function was to gather evidence that might be used against him in connection with the crime for which he was incarcerated." *Penry* v. *State*, 903 S. W. 2d 715, 759–760 (1995) (internal quotation marks and citation omitted).

The court also rejected Penry's claim that the jury instructions given at his second sentencing hearing were constitutionally inadequate because they did not permit the jury to consider and give effect to his mitigating evidence of mental retardation and childhood abuse. The court cited *Penry I* for the proposition that when a defendant proffers "mitigating evidence that is not relevant to the special issues or that has relevance to the defendant's moral culpability beyond the scope of the special issues . . . the jury must be given a special instruction in order to allow it to consider and give effect to such evidence." 903 S. W. 2d, at 765. Quoting the supplemental jury instruction given at Penry's second trial, see *supra*, at 789–790, the court overruled Penry's claim of error. The court stated that "a nullification instruction such as this one is sufficient to meet the constitutional requirements of *[Penry I]*." 903 S. W. 2d, at 765.

In 1998, after his petition for state habeas corpus relief was denied, see App. 841 (trial court order); *id.*, at 863 (Court of Criminal Appeals order), Penry filed a petition for a writ of habeas corpus pursuant to 28 U. S. C. § 2254 (1994 ed. and Supp. V) in the United States District Court for the Southern District of Texas. The District Court rejected both of Penry's claims, finding that the Texas Court of Criminal Appeals' conclusions on both points were neither contrary

to, nor an unreasonable application of, clearly established federal law. App. 893, 920. After full briefing and argument, the United States Court of Appeals for the Fifth Circuit denied a certificate of appealability. 215 F. 3d 504 (2000).

We stayed Penry's execution and granted certiorari to consider Penry's constitutional arguments regarding the admission of the Peebles report and the adequacy of the jury instructions. 531 U. S. 1010 (2000).

## II

Because Penry filed his federal habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, the provisions of that law govern the scope of our review. Specifically, 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. V) prohibits a federal court from granting an application for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

Last Term in *Williams* v. *Taylor*, 529 U. S. 362 (2000), we explained that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. *Id.*, at 404. A state court decision will be "contrary to" our clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.*, at 405–406. A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.*, at 407–408.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.*, at 409. Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable. *Id.*, at 410–411.

Although the District Court evaluated the Texas Court of Criminal Appeals' disposition of Penry's claims under a standard we later rejected in *Williams,* see App. 882 (stating that an application of law to facts is "unreasonable 'only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect'" (citation omitted)), the Fifth Circuit articulated the proper standard of review, as set forth in § 2254(d)(1) and clarified in *Williams,* and denied Penry relief. Guided by this same standard, we now turn to the substance of Penry's claims.

## III

### A

Penry contends that the admission into evidence of the portion of the 1977 Peebles report that referred to Penry's future dangerousness violated his Fifth Amendment privilege against self-incrimination because he was never warned that the statements he made to Dr. Peebles might later be used against him. The Texas Court of Criminal Appeals disagreed, concluding that when Dr. Peebles interviewed Penry, Peebles was not acting as an agent for the State in order to gather evidence that might be used against Penry. 903 S. W. 2d, at 759.

Penry argues that this case is indistinguishable from *Estelle* v. *Smith,* 451 U. S. 454 (1981). In *Estelle,* we considered a situation in which a psychiatrist conducted an

ostensibly neutral competency examination of a capital defendant, but drew conclusions from the defendant's uncounseled statements regarding his future dangerousness, and later testified for the prosecution on that crucial issue. We likened the psychiatrist to "an agent of the State recounting unwarned statements made in a postarrest custodial setting," and held that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.*, at 467–468. The admission of the psychiatrist's testimony under those "distinct circumstances" violated the Fifth Amendment. *Id.*, at 466.

This case differs from *Estelle* in several respects. First, the defendant in *Estelle* had not placed his mental condition at issue, *id.*, at 457, n. 1, whereas Penry himself made his mental status a central issue in both the 1977 rape case and his trials for Pamela Carpenter's rape and murder. Second, in *Estelle,* the trial court had called for the competency evaluation and the State had chosen the examining psychiatrist. *Id.*, at 456–457. Here, however, it was Penry's own counsel in the 1977 case who requested the psychiatric exam performed by Dr. Peebles. Third, in *Estelle,* the State had called the psychiatrist to testify as a part of its affirmative case. *Id.*, at 459. Here, it was during the cross-examination of Penry's own psychological witness that the prosecutor elicited the quotation from the Peebles report. And fourth, in *Estelle,* the defendant was charged with a capital crime at the time of his competency exam, and it was thus clear that his future dangerousness would be a specific issue at sentencing. Penry, however, had not yet murdered Pamela Carpenter at the time of his interview with Dr. Peebles.

We need not and do not decide whether these differences affect the merits of Penry's Fifth Amendment claim.

Rather, the question is whether the Texas court's decision was contrary to or an unreasonable application of our precedent. 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. V). We think it was not. The differences between this case and *Estelle* are substantial, and our opinion in *Estelle* suggested that our holding was limited to the "distinct circumstances" presented there. It also indicated that the Fifth Amendment analysis might be different where a defendant "intends to introduce psychiatric evidence at the penalty phase." 451 U. S., at 472. Indeed, we have never extended *Estelle*'s Fifth Amendment holding beyond its particular facts. Cf., *e. g.*, *Buchanan* v. *Kentucky*, 483 U. S. 402 (1987) (*Estelle* does not apply, and it does not violate the Fifth Amendment, where a prosecutor uses portions of a psychiatric evaluation requested by a defendant to rebut psychiatric evidence presented by the defendant at trial). We therefore cannot say that it was objectively unreasonable for the Texas court to conclude that Penry is not entitled to relief on his Fifth Amendment claim.

Even if our precedent were to establish squarely that the prosecution's use of the Peebles report violated Penry's Fifth Amendment privilege against self-incrimination, that error would justify overturning Penry's sentence only if Penry could establish that the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht* v. *Abrahamson*, 507 U. S. 619, 637 (1993) (quoting *Kotteakos* v. *United States*, 328 U. S. 750, 776 (1946)). We think it unlikely that Penry could make such a showing.

The excerpt from the Peebles report bolstered the State's argument that Penry posed a future danger, but it was neither the first nor the last opinion the jury heard on that point. Four prison officials testified that they were of the opinion that Penry "would commit criminal acts of violence that would constitute a continuing threat to society." App. 94, 104, 138; 47 Record 970. Three psychiatrists tes-

tified that Penry was a dangerous individual and likely to remain so. Two were the State's own witnesses. See App. 487, 557. The third was Dr. Price—the same defense witness whom the prosecutor had asked to read from the Peebles report. Before that recitation, Dr. Price had stated his own opinion that "[i]f [Penry] was in the free world, I would consider him dangerous." *Id.*, at 392.

While the Peebles report was an effective rhetorical tool, it was by no means the key to the State's case on the question whether Penry was likely to commit future acts of violence. We therefore have considerable doubt that the admission of the Peebles report, even if erroneous, had a "substantial and injurious effect" on the verdict. *Brecht* v. *Abrahamson, supra*, at 637. Accordingly, we will not disturb the Texas Court of Criminal Appeals' rejection of Penry's Fifth Amendment claim.

## B

Penry also contends that the jury instructions given at his second sentencing hearing did not comport with our holding in *Penry I* because they did not provide the jury with a vehicle for expressing its reasoned moral response to the mitigating evidence of Penry's mental retardation and childhood abuse. The Texas Court of Criminal Appeals disagreed. The court summarized *Penry I* as holding that when a defendant proffers "mitigating evidence that is not relevant to the special issues or that has relevance to the defendant's moral culpability beyond the scope of the special issues . . . the jury must be given a special instruction in order to allow it to consider and give effect to such evidence." 903 S. W. 2d, at 765. The court then stated that the supplemental jury instruction given at Penry's second sentencing hearing satisfied that mandate. *Ibid.*

The Texas court did not make the rationale of its holding entirely clear. On one hand, it might have believed that *Penry I* was satisfied merely by virtue of the fact that

a supplemental instruction had been given. On the other hand, it might have believed that it was the substance of that instruction which satisfied *Penry I.*

While the latter seems to be more likely, to the extent it was the former, the Texas court clearly misapprehended our prior decision. *Penry I* did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence. Rather, the key under *Penry I* is that the jury be able to "consider and *give effect to* [a defendant's mitigating] evidence in imposing sentence." 492 U. S., at 319 (emphasis added). See also *Johnson* v. *Texas,* 509 U. S. 350, 381 (1993) (O'CONNOR, J., dissenting) ("[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances" (emphasis in original)). For it is only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," *Penry I,* 492 U. S., at 328, that we can be sure that the jury "has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence," *id.,* at 319 (quoting *Woodson* v. *North Carolina,* 428 U. S. 280, 304, 305 (1976)).

The State contends that the substance of the supplemental instruction satisfied *Penry I* because it provided the jury with the requisite vehicle for expressing its reasoned moral response to Penry's particular mitigating evidence. Specifically, the State points to the admittedly "less than artful" portion of the supplemental instruction which says:

> "If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability *at the time you answer the special issue.* If you de-

termine, when giving effect to the mitigating evidence, if any, that a life sentence, *as reflected by a negative finding to the issue under consideration,* rather than a death sentence, is an appropriate response to the personal culpability of the defendant, *a negative finding should be given to one of the special issues."* App. 675 (emphasis added). See also Brief for Respondent 16.

We see two possible ways to interpret this confusing instruction. First, as the portions italicized above indicate, it can be understood as telling the jurors to take Penry's mitigating evidence into account in determining their truthful answers to each special issue. Viewed in this light, however, the supplemental instruction placed the jury in no better position than was the jury in *Penry I.* As we made clear in *Penry I,* none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse. Cf. 492 U. S., at 322–325. In the words of Judge Dennis below, the jury's ability to consider and give effect to Penry's mitigating evidence was still "shackled and confined within the scope of the three special issues." 215 F. 3d, at 514 (dissenting opinion). Thus, because the supplemental instruction had no practical effect, the jury instructions at Penry's second sentencing were not meaningfully different from the ones we found constitutionally inadequate in *Penry I.*

Alternatively, the State urges, it is possible to understand the supplemental instruction as informing the jury that it could "simply answer one of the special issues 'no' if it believed that mitigating circumstances made a life sentence . . . appropriate . . . regardless of its initial answers to the questions." Brief for Respondent 16. The Texas Court of Criminal Appeals appeared to understand the instruction in this sense, when it termed the supplemental instruction a "nullification instruction." 903 S. W. 2d, at 765. Even assuming the jurors could have understood the instruc-

tion to operate in this way, the instruction was not as simple to implement as the State contends. Rather, it made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation.

The jury was clearly instructed that a "yes" answer to a special issue was appropriate only when supported "by the evidence beyond a reasonable doubt." App. 672. A "no" answer was appropriate only when there was "a reasonable doubt as to whether the answer to a Special Issue should be . . . 'Yes.'" *Id.,* at 673. The verdict form listed the three special issues and, with no mention of mitigating circumstances, confirmed and clarified the jury's two choices with respect to each special issue. The jury could swear that it had unanimously determined "beyond a reasonable doubt that the answer to this Special Issue is 'Yes.'" *Id.,* at 676–678. Or it could swear that at least 10 jurors had "a reasonable doubt *as to the matter inquired about in this Special Issue*" and that the jury thus had "determin[ed] that the answer to this Special Issue is 'No.'" *Ibid.* (emphasis added).

In the State's view, however, the jury was also told that it could ignore these clear guidelines and—even if there was in fact no reasonable doubt as to the matter inquired about—answer any special issue in the negative if the mitigating circumstances warranted a life sentence. In other words, the jury could change one or more truthful "yes" answers to an untruthful "no" answer in order to avoid a death sentence for Penry.

We generally presume that jurors follow their instructions. See, *e. g., Richardson* v. *Marsh,* 481 U. S. 200, 211 (1987). Here, however, it would have been both logically and ethically impossible for a juror to follow both sets of instructions. Because Penry's mitigating evidence did not fit within the scope of the special issues, answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental in-

struction. And answering the special issues in the mode prescribed by the supplemental instruction necessarily meant ignoring the verdict form instructions. Indeed, jurors who wanted to answer one of the special issues falsely to give effect to the mitigating evidence would have had to violate their oath to render a "'true verdict.'" Tex. Code Crim. Proc. Ann., Art. 35.22 (Vernon 1989).

The mechanism created by the supplemental instruction thus inserted "an element of capriciousness" into the sentencing decision, "making the jurors' power to avoid the death penalty dependent on their willingness" to elevate the supplemental instruction over the verdict form instructions. *Roberts* v. *Louisiana*, 428 U. S. 325, 335 (1976) (plurality opinion). There is, at the very least, "a reasonable likelihood that the jury . . . applied the challenged instruction in a way that prevent[ed] the consideration" of Penry's mental retardation and childhood abuse. *Boyde* v. *California*, 494 U. S. 370, 380 (1990). The supplemental instruction therefore provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence.

Even though the Texas Court of Criminal Appeals focused solely on the supplemental instruction in affirming Penry's sentence, the State urges us to evaluate the instruction contextually, with reference to the comments of the prosecutor and defense counsel, as well as the comments of the court during *voir dire*. Indeed, we have said that we will approach jury instructions in the same way a jury would—with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.*, at 381. *Penry I* itself illustrates this methodology, as there we evaluated the likely effect on the jury of the comments of the defense counsel and prosecutor. 492 U. S., at 325–326. As we did there, however, we conclude that these comments were insufficient to clarify the confusion caused by the instructions themselves.

*Voir dire* was a month-long process, during which approximately 90 prospective jurors were interviewed. See 3 Record (index of transcripts). Many of the venire members—including each of the 12 jurors who was eventually empaneled—received a copy of an instruction largely similar to the supplemental instruction ultimately given to the jury. After each juror read the instruction, the judge attempted to explain how it worked. See, *e. g.*, 18 Record 966–967 ("[I]f you thought the mitigating evidence was sufficient . . . you might, even though you really felt those answers [to the three special issues] should be yes, you might answer one or more of them no . . . so [Penry] could get the life sentence rather than the death penalty"). The prosecutor then attempted to explain the instruction. See, *e. g.*, *id.*, at 980 ("[E]ven though [you] believe all three of these answers are yes, [you] don't think the death penalty is appropriate for this particular person because of what has happened to him in the past . . . . [The] instruction is to give effect to that belief and answer one or all of these issues no"). And with most of the jurors, defense counsel also gave a similar explanation. See, *e. g.*, *id.*, at 1018 ("[I]f you believe[d] [there] was a mitigating circumstance . . . you [could] apply that mitigation to answer—going back and changing an answer from yes to a no").

While these comments reinforce the State's construction of the supplemental instruction, they do not bolster our confidence in the jurors' ability to give effect to Penry's mitigating evidence in deciding his sentence. Rather, they highlight the arbitrary way in which the supplemental instruction operated, and the fact that the jury was essentially instructed to return a false answer to a special issue in order to avoid a death sentence.

Moreover, we are skeptical that, by the time their penalty phase deliberations began, the jurors would have remembered the explanations given during *voir dire*, much less taken them as a binding statement of the law. *Voir dire*

began almost two full months before the penalty phase deliberations. In the interim, the jurors had observed the rest of *voir dire*, listened to a 5-day guilt-phase trial and extensive instructions, participated in 2½ hours of deliberations with respect to Penry's guilt, and listened to another 5-day trial on punishment. The comments of the court and counsel during *voir dire* were surely a distant and convoluted memory by the time the jurors began their deliberations on Penry's sentence.

The State also contends that the closing arguments in the penalty phase clarified matters. Penry's counsel attempted to describe the jury's task:

> "If, when you thought about mental retardation and the child abuse, you think that this guy deserves a life sentence, and not a death sentence, . . . then, you get to answer one of . . . those questions no. The Judge has not told you which question, and you have to give that answer, even if you decide the literally correct answer is yes. Not the easiest instruction to follow and the law does funny things sometimes." App. 640.

Again, however, this explanation only reminded the jurors that they had to answer the special issues *dis*honestly in order to give effect to Penry's mitigating evidence. For the reasons discussed above, such a "clarification" provided no real help. Moreover, even if we thought that the arguments of defense counsel could be an adequate substitute for statements of the law by the court, but see *Boyde* v. *California*, *supra*, at 384, the prosecutor effectively neutralized defense counsel's argument, as did the prosecutor in *Penry I*, by stressing the jury's duty "[t]o follow your oath, the evidence and the law." App. 616. At best, the jury received mixed signals.

Our opinion in *Penry I* provided sufficient guidance as to how the trial court might have drafted the jury charge for Penry's second sentencing hearing to comply with our

mandate. We specifically indicated that our concerns would have been alleviated by a jury instruction defining the term "deliberately" in the first special issue "in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability." 492 U. S., at 323. The trial court surely could have drafted an instruction to this effect. Indeed, Penry offered two definitions of "deliberately" that the trial court refused to give. See Tr. of Oral Arg. 12, 14–15.

A clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I.* Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. Texas now requires the jury to decide "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." Tex. Code Crim. Proc. Ann., Art. 37.071(2)(e)(1) (Vernon Supp. 2001).* Penry's counsel, while not conceding the issue, admitted that he "would have a tough time saying that *[Penry II]* was not complied with under the new Texas procedure." Tr. of Oral Arg. 16. At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.

Thus, to the extent the Texas Court of Criminal Appeals concluded that the substance of the jury instructions given

---

*Another recent development in Texas is the passage of a bill banning the execution of mentally retarded persons. See Babineck, Perry: Death-penalty measure needs analyzing, Dallas Morning News, May 31, 2001, p. 27A. As this opinion goes to press, Texas Governor Rick Perry is still in the process of deciding whether to sign the bill. *Ibid.*

at Penry's second sentencing hearing satisfied our mandate in *Penry I*, that determination was objectively unreasonable. Cf. *Shafer* v. *South Carolina, ante,* at 40, 50 (holding on direct review that the South Carolina Supreme Court "incorrectly limited" our holding in *Simmons* v. *South Carolina,* 512 U. S. 154 (1994), because the court had mischaracterized "how the State's new [capital sentencing] scheme works"). The three special issues submitted to the jury were identical to the ones we found constitutionally inadequate as applied in *Penry I.* Although the supplemental instruction made mention of mitigating evidence, the mechanism it purported to create for the jurors to give effect to that evidence was ineffective and illogical. The comments of the court and counsel accomplished little by way of clarification. Any realistic assessment of the manner in which the supplemental instruction operated would therefore lead to the same conclusion we reached in *Penry I:* "[A] reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." 492 U. S., at 326.

The judgment of the United States Court of Appeals for the Fifth Circuit is therefore affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, concurring in Parts I, II, and III–A, and dissenting in Part III–B.

Two Texas juries have now deliberated and reasoned that Penry's brutal rape and murder of Pamela Carpenter warrants the death penalty under Texas law. And two opinions of this Court have now overruled those decisions on the ground that the sentencing courts should have said more about Penry's alleged mitigating evidence. Because I believe the most recent sentencing court gave the jurors

an opportunity to consider the evidence Penry presented, I respectfully dissent.

As a habeas reviewing court, we are not called upon to propose what we believe to be the ideal instruction on how a jury should take into account evidence related to Penry's childhood and mental status. Our job is much simpler, and it is significantly removed from writing the instruction in the first instance. We must decide merely whether the conclusion of the Texas Court of Criminal Appeals—that the sentencing court's supplemental instruction explaining how the jury could give effect to any mitigating value it found in Penry's evidence satisfied the requirements of *Penry* v. *Lynaugh,* 492 U. S. 302 (1989) *(Penry I)*—was "objectively unreasonable." *Williams* v. *Taylor,* 529 U. S. 362, 409 (2000). See also 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. V).

At Penry's first sentencing, the court read to the jury Texas' three special issues for capital sentencing.[1] The court did not instruct the jury that "it could consider the evidence offered by Penry as *mitigating* evidence and that it could give mitigating effect to that evidence in imposing sentence." 492 U. S., at 320. The prosecutor also did not' offer any way for the jury to give mitigating effect to the evidence, but instead simply reiterated that the jury was to answer the three questions and follow the law. In *Penry I,* this Court concluded that, "[i]n light of the prosecutor's ar-

---

[1] The special issues are:

"'(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"'(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"'(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.'" *Penry I,* 492 U. S. 302, 310 (1989) (quoting Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981 and Supp. 1989)).

gument, and in the absence of appropriate jury instructions, a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.*, at 326.

At Penry's second sentencing, the court read to the jury the same three special issues. In contrast to the first sentencing, however, the court instructed the jury at length that it could consider Penry's proffered evidence as mitigating evidence and that it could give mitigating effect to that evidence. See *ante*, at 789–790. The Texas Court of Criminal Appeals concluded that this supplemental instruction "allow[ed] [the jury] to consider and give effect to" Penry's proffered mitigating evidence and therefore was "sufficient to meet the constitutional requirements of *[Penry I]*."[2] *Penry* v. *State*, 903 S. W. 2d 715, 765 (1995). In my view, this decision is not only objectively reasonable but also compelled by this Court's precedents and by common sense.

"In evaluating the instructions, [a court should] not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson* v. *Texas*, 509 U. S. 350, 368 (1993) (quoting *Boyde* v. *California*, 494 U. S. 370, 381 (1990)). The Texas court's instruction, read for common sense, or, even after a technical parsing, tells jurors that they may consider the

---

[2] This Court's suggestion that the Texas court may have believed that any supplemental instruction, regardless of its substance, would satisfy *Penry I*'s requirement, see *ante*, at 796–797, is specious. The Texas court explained that a "jury must be given a special instruction *in order to allow it to consider and give effect to such evidence*"; it quoted the full text of the supplemental instruction; and it concluded that "a nullification instruction *such as this one* is sufficient to meet the constitutional requirements of *[Penry I]*." *Penry* v. *State*, 903 S. W. 2d 715, 765 (1995) (emphasis added). It is quite obvious that the court based its legal conclusion on the content of the supplemental instruction.

evidence Penry presented as mitigating evidence and that, if they believe the mitigating evidence makes a death sentence inappropriate, they should answer "no" to one of the special issues. Given this straightforward reading of the instructions, it is objectively reasonable, if not eminently logical, to conclude that a reasonable juror would have believed he had a "vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." 492 U. S., at 326.

It is true that Penry's proffered evidence did not fit neatly into any of the three special issues for imposing the death penalty under Texas law.[3] But the sentencing court told the jury in no uncertain terms precisely how to follow this Court's directive in *Penry I*. First, the sentencing court instructed the jury that it could consider such evidence to be mitigating evidence. See App. 675 ("[W]hen you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case"). Next, the court explained to the jury how it must give effect to the evidence. *Ibid.* ("If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue"). And finally, the court unambiguously instructed: "If you determine, when giving

---

[3] I am still bewildered as to why this Court finds it unconstitutional for Texas to limit consideration of mitigating evidence to those factors relevant to the three special issues. See *Graham* v. *Collins*, 506 U. S. 461, 478 (1993) (THOMAS, J., concurring). But we need not address this broader issue to uphold Penry's sentence.

effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, *a negative finding should be given to one of the special issues." Ibid.* (emphasis added). Without performing legal acrobatics, I cannot make the instruction confusing. And I certainly cannot do the contortions necessary to find the Texas appellate court's decision "objectively unreasonable."[4] I simply do not share the Court's confusion as to how a juror could consider mitigating evidence, decide whether it makes a death sentence inappropriate, and respond with a "yes" or "no" depending on the answer.

---

[4] I think we need not look beyond the court's instructions in evaluating the Texas appellate court's decision. But even if there were any doubt as to whether the instruction led the jurors to believe there was a vehicle for giving mitigating effect to Penry's evidence, the instruction was made clear "'in the light of all that ha[d] taken place at the trial.'" *Johnson* v. *Texas,* 509 U. S. 350, 368 (1993). The judge and prosecutor fully explained how to give effect to mitigating evidence during the *voir dire* process, and defense counsel made the instruction clear in closing: "[i]f, when you thought about mental retardation and the child abuse, you think that this guy deserves a life sentence, and not a death sentence, . . . then, you get to answer one of . . . those questions no," App. 640. Even if the jurors had forgotten what they had been told at *voir dire,* see *ante,* at 801–802, an assumption that I find questionable given our presumptions about jurors' ability to remember and follow instructions, see, *e. g., Weeks* v. *Angelone,* 528 U. S. 225, 234 (2000), the defense counsel's explanation from closing arguments would have been fresh on their minds.

Despite the Court's assertion that defense counsel told the jurors to answer the questions dishonestly, *ante,* at 802, it seems to me that the jurors reasonably could have believed that they could honestly answer any question "no" if they found that the death sentence would be inappropriate given the mitigating evidence. They could follow their "'oath, the evidence and the law,'" *ibid.* (quoting the prosecutor's statement, App. 616), by truthfully concluding that the evidence of Penry's childhood and mental status did not warrant the death penalty and by writing "no" next to one of the special issues.

Curiously, this Court concludes that the supplemental instruction "inserted 'an element of capriciousness' into the sentencing decision, 'making the jurors' power to avoid the death penalty dependent on their willingness' to elevate the supplemental instruction over the verdict form instructions." *Ante*, at 800 (quoting *Roberts* v. *Louisiana*, 428 U. S. 325, 335 (1976) (plurality opinion)). Any reference to *Roberts*, however, is wholly misplaced. *Roberts* involved a situation in which the jury was told to find the defendant guilty of a lesser included offense, unsupported by any evidence, if the jury did not want him to be sentenced to death. *Id.*, at 334–335. In Penry's case there was no suggestion, express or implied, made to the jury that it could *disregard* the evidence. On the contrary, it was instructed on how to *give effect to* Penry's proffered evidence, as required by this Court in *Penry I.* Tellingly, the *Roberts* plurality stated in full that "[t]here is an element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept this invitation to *disregard the trial judge's instructions.*" 428 U. S., at 335 (emphasis added). In Penry's case, the judge's instructions included an explanation of how to answer the three special issues and how to give effect to the mitigating evidence.

Finally, contrary to the Court's claim that the jury received "mixed signals," *ante*, at 802, it appears that it is the Texas courts that have received the mixed signals. In *Jurek* v. *Texas*, 428 U. S. 262 (1976), this Court upheld the Texas sentencing statute at issue here against attack under the Eighth and Fourteenth Amendments. The joint opinion in *Jurek* concluded that the statute permits the jury "to consider whatever evidence of mitigating circumstances the defense can bring before it" and "guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Id.*, at

273–274 (opinion of Stewart, Powell, and STEVENS, JJ.). Then, while purporting to distinguish, rather than to overrule, *Jurek*, this Court in *Penry I* determined that the same Texas statute was constitutionally insufficient by not permitting jurors to give effect to mitigating evidence. 492 U. S., at 328. See also *id.*, at 355–356 (SCALIA, J., dissenting) (explaining how *Penry I* contradicts *Jurek*'s conclusions). According to the Court, an instruction informing the jury that it could give effect to the mitigating evidence was necessary. 492 U. S., at 328. And in today's decision, this Court yet again has second-guessed itself and decided that even this supplemental instruction is not constitutionally sufficient.