**Kathleen Mae FIRMINGHAM,**
**Plaintiff–Appellant,**

v.

**Joan YUKINS, Defendant–Appellee.**

**No. 00–1156.**

United States Court of Appeals,
Sixth Circuit.

Dec. 6, 2001.

Before BOGGS and GILMAN, Circuit Judges; and QUIST, District Judge.*

## OPINION

QUIST, District Judge.

Kathleen Mae Firmingham, a pro se Michigan prisoner, appeals a district court judgment dismissing her petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. For the reasons set forth below, we AFFIRM the judgment of the district court.

## I.  BACKGROUND

A.  Factual Background

Petitioner was accused of aiding and abetting the murder of her husband, Scott Firmingham. According to the evidence presented at trial, Petitioner acted in consort with her boyfriend, Duane Boyer, and her neighbors Paul and Christine Haw-

kins. Petitioner wanted to kill her husband because she feared that he would learn of her affair with Boyer. On April 4, 1991, Petitioner, Boyer and the Hawkins discussed a plan to kill Petitioner's husband. They carried out the plan that night. Christine Hawkins knocked on Petitioner's door and lured Scott Firmingham into the Hawkins' home by telling him that a fuse needed to be replaced. After the victim entered the house, Boyer grabbed the victim from behind and held him while Paul Hawkins fatally stabbed him in the chest with a large knife. After the incident, the victim's body was wrapped in a blanket and placed in the trunk of Petitioner's car. The four participants, with Petitioner's two children and the Hawkins' daughter, drove in two cars to a rural area where Boyer dumped the body in a field. On June 25, 1991, construction workers discovered a man's body in a water-filled manhole. The body bore two stab wounds to the chest. Nearly a year later, the body was identified as that of Scott Firmingham, Petitioner's husband.

On two occasions, Petitioner was approached at her home by police detectives who wanted to question her regarding her husband's disappearance. On both occasions, Petitioner agreed to talk with the detectives and voluntarily accompanied them to a police station. The first interview was conducted by Detective Roberts at the Jackson County Police Department on June 18, 1991. During the first forty-five minutes of the two hour and fifteen minute interview, Roberts asked Petitioner simple and direct investigatory questions to establish a chronology of events surrounding her husband's disappearance. Petitioner described the last time she saw her husband, her troubled marriage, her relationship with her in-laws, and her

---

\* The Honorable Gordon J. Quist, District Judge of the United States District Court for the Western District of Michigan, sitting by designation.

friendship with Duane Boyer. Throughout this period, Roberts never interrupted Petitioner nor challenged her version of the events. However, once Roberts began taping the interview, he actively confronted Petitioner about her husband's disappearance and her involvement with Boyer. Roberts called Petitioner a liar, opined that she would eventually tell him what he believed to be the truth, intimated that to maintain her existing story would be disadvantageous, and reminded her to be careful in her responses because he was filing a report with the prosecutor. As Petitioner was increasingly subjected to hostile questioning by Roberts, she admitted that she had been having an affair with Boyer since the summer of 1990. Eventually, she implicated Boyer and her neighbors, Paul and Christine Hawkins, in the murder of her husband. Petitioner claimed to have learned of the murder only after the fact.

Petitioner was asked for a second interview on June 20. The interview was conducted by Detective Roberts at the Hillsdale County Sheriff's Department. Roberts immediately confronted Petitioner about her specific knowledge and involvement in the plan to kill her husband. At first, Petitioner further implicated Boyer and Paul and Christine Hawkins. When told by Roberts that her account conflicted with the accounts of the other three suspects, Petitioner conceded that she had known of the plan to kill her husband before it was carried out, but Petitioner insisted that the plot had been conceived and implemented by the others. Petitioner claimed to have attempted to dissuade the others, and believed that she had succeeded until she later learned that they had gone through with their plan. At this point, another detective interrupted the interview and read Petitioner her *Miranda*[1] rights and warned that her ar-

rest was imminent. Petitioner agreed to continue the interview and made more of the same type of inculpatory statements. The interview concluded a few minutes later, and Petitioner was arrested.

## B. Procedural Background

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. Petitioner raised two claims of error on appeal. With regard to Petitioner's claim that her statements were taken in violation of *Miranda* and should have been suppressed at trial, the court of appeals concluded that Petitioner was not "in custody" during the interviews; therefore, the detectives were not required to advise her of her rights. The Michigan Court of Appeals also concluded that there was sufficient evidence to support her conviction. The Michigan Supreme Court subsequently denied Petitioner's delayed application for leave to appeal.

Petitioner filed the instant petition for habeas corpus relief raising the same two issues presented before the state appellate courts. The magistrate judge issued a report and recommendation for dismissal of the petition. The magistrate judge concluded that the last ninety minutes (the taped portion) of the June 18, 1991, interrogation occurred in a custodial environment where Petitioner was improperly deprived of *Miranda* warnings prior to making inculpatory statements, and those statements should have been suppressed by the state courts. The magistrate judge further concluded that shortly after the June 20 interview began, Petitioner was subjected to impermissible custodial interrogation in the absence of *Miranda* warnings. The magistrate judge found that the violation continued until Petitioner was informed of her *Miranda* rights near the end of the interview. The magistrate

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

judge determined, however, that the error of admitting the unwarned statements was harmless. The magistrate judge also found that there was sufficient evidence to support Petitioner's first-degree murder conviction. The report and recommendation was adopted by the district court in a summary order and judgment.

## II. ANALYSIS

### A. Standard of Review

We review a district court's legal conclusions in a habeas proceeding *de novo* and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir.1999).

### B. The district court failed to apply the correct standard of review in finding that Petitioner's *Miranda* rights were violated.

Because Petitioner filed her habeas application after the enactment of the Antiterrorism and Effective Death Penalty Act, PUB. L. 104–132, 110 STAT. 1214 ("AEDPA"), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). The district court, however, did not cite or apply the highly deferential AEDPA standard in deciding Petitioner's case. Pursuant to the AEDPA, an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA expressly limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 317–18 (6th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 292, —— L.Ed.2d —— (2001). Thus, to justify a grant of habeas corpus relief, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).

A decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. at 1523. A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. at 1522. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410, 120 S.Ct. at 1522.

C. Petitioner is not entitled to habeas corpus relief based upon the alleged *Miranda* violations.

This case presents a close question on the *Miranda* issue. If the district court had properly applied the highly deferential AEDPA standard, it might have concluded that the decision of the Michigan Court of Appeals was not an unreasonable application of clearly established law as determined by the Supreme Court. Assuming the decision of the Michigan Court of Appeals was unreasonable and Petitioner's *Miranda* rights were violated, we agree with the district court that the error was harmless.

■■■■ In order for this Court to find that the admission of this evidence was not harmless, we must find that the trial court's error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The *Brecht* standard continues to apply on habeas review following the amendments to the AEDPA. *See Penry,* 121 S.Ct. at 1919–1920. The habeas petitioner must establish that the error resulted in actual prejudice. *McGhee v. Yukins,* 229 F.3d 506, 512 (6th Cir.2000). The harmless error standard announced in *Brecht* applies even if a federal habeas court is the first to review for harmless error. *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir.1999), *cert denied,* 528 U.S. 1120, 120 S.Ct. 945, 145 L.Ed.2d 821 (2000).

■■■■ Applying *Brecht,* the district court concluded that "the admissibility of Petitioner's inculpatory statements on June 18 and her pre-Mirandized statements on June 20 did not have a substantial and injurious effect or influence in determining the jury's verdict." We agree. While the jury could have inferred Petitioner's guilt from the content of her inadmissible statements, she never admitted to participating in the planning or execution of the murder. The testimony of Paul Hawkins, on the other hand, provided detailed evidence concerning Petitioner's motive and her involvement in the planning of her husband's murder and the aftermath. Other witnesses also provided evidence of motive. Moreover, Petitioner's post-*Miranda* statements, in which she made the same type of inculpatory statements as she made during the pre-*Miranda* interrogation, were admissible. Because Petitioner's inadmissible statements were not essential to establishing her guilt, any resulting error was harmless.

D. The district court correctly concluded that there was sufficient evidence to support Petitioner's conviction for first-degree murder.

■■■■ Petitioner also claims on appeal that there was insufficient evidence to support her conviction for first-degree murder on a theory of aiding and abetting. In Michigan, the elements of first-degree murder are that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate. *People v. Anderson,* 209 Mich.App. 527, 531 N.W.2d 780 (Mich.App.1995). The elements that must be proved to convict a defendant as an aider and abettor are (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement, and the defendant's state of mind may be inferred from all the facts and circumstances of the case. *People v. Turner,* 213 Mich.App. 558, 540 N.W.2d 728 (Mich.App.1995).

Applying *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the district court concluded that sufficient evidence was presented at trial to find Petitioner guilty beyond a reasonable doubt. The court relied heavily upon the testimony of Paul Hawkins. Hawkins testified that he was approached several times by Petitioner and her boyfriend, Duane Boyer, to participate in the murder of Petitioner's husband. Hawkins also stated that Petitioner discussed "getting rid of her husband for good, as in means of killing him" out of fear that he would soon discover the affair with Boyer. Hawkins further testified that the group exchanged ideas, but it was Petitioner's plan to have Christine Hawkins lure Firmingham outside the house under the guise that a fuse needed to be changed. Hawkins described Petitioner as "ecstatic" when she learned that her husband had been fatally stabbed by him and Boyer. Hawkins testified that Petitioner provided keys and a blanket to conceal the body in the trunk of her car. Finally, Hawkins testified that Petitioner and Boyer drove to an area near an old plant where Boyer disposed of the body in a field.

From the testimony of Paul Hawkins alone, the district court found sufficient evidence to sustain the murder conviction. The court also cited the testimony of George Firmingham, Jr., and Edward Mitchell, who testified that Petitioner made various statements indicating that she would kill Scott Firmingham or have him killed if he attempted to leave with her children or follow her to Jackson, Michigan. Once again, the district court conducted a *de novo* review of the issue and failed to apply the AEDPA standard. Notwithstanding the district court's failure to apply the proper standard, we agree with the district court's conclusion that the Michigan Court of Appeals's decision was not an unreasonable application of clearly established federal law as determined by the Supreme Court.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.