**Cristobal Rodriguez BENITEZ, Petitioner,**

v.

**Sylvia GARCIA, Warden, et al., Respondents.**

No. 02CV0489DMS (AJB).

United States District Court, S.D. California.

June 7, 2004.

Barbara K. Strickland, Law Offices of Barbara K. Strickland, San Diego, CA, for Petitioner.

Attorney General, Office of the Attorney General, San Diego, CA, for Respondents.

## ORDER ADOPTING RECOMMENDATION OF MAGISTRATE JUDGE IN PART AND DENYING PETITION FOR WRIT OF HABEAS CORPUS

SABRAW, District Judge.

On March 14, 2002, Petitioner Cristobal Rodriguez Benitez ("Petitioner" or "Benitez"), a state prisoner proceeding with the assistance of counsel, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition"). Petitioner previously had been extradited from Venezuela to the United States on a charge of murder, and later convicted of that offense by a state jury. In his Petition, Benitez claims the punishment he received from the state court violates the terms of the extradition treaty between the United States and Venezuela, and the trial court committed error when it instructed the jury.

On September 8, 2003, following briefing by the parties, the Magistrate Judge formerly assigned to this case issued a Report and Recommendation ("Report"). The Report concludes the California District Court of Appeal ("state court") erred in upholding a 19–years–to–life indeterminate sentence because the sentence violates the Venezuelan extradition decree, which limits Petitioner's punishment to no more than thirty years incarceration. The Report, however, recommends the Petition be denied without prejudice because Petitioner has not yet served a term in excess of thirty years. It further recommends that Petitioner be able to pursue his claim after thirty years incarceration without a statute of limitations bar. In the alternative, it recommends the matter be remanded to state court for resentencing, to incorporate the extradition decree's thirty year maximum prison term.

On September 24, 2003, Respondents filed Objections to the Report, contending the Report fails to give sufficient deference to the state court decision and fails to provide an adequate analysis under the stringent habeas review standards imposed by the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Petitioner submitted no Objections to the Report.[1]

---

1. The Report also concludes the trial court's decision not to instruct the jury on manslaughter based on sudden quarrel or heat of passion did not present a cognizable federal claim, impinging neither Petitioner's due process nor Sixth Amendment rights to a jury trial. Because Petitioner did not object to the Report, the Court adopts without further dis-

After review and consideration of the Petition, Answer, Traverse, Report, Objections to Report and Recommendation, and all relevant authorities, the Court adopts the Report in part and DENIES the Petition in its entirety. As discussed below, the state court's conclusion that Petitioner's indeterminate sentence does not violate the treaty is neither contrary to, nor an unreasonable application of, clearly established federal law.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On September 13, 1993, Petitioner's brother, Ricardo Rodriguez, had an altercation with Isidro Valle that resulted in Petitioner shooting and killing Valle. After the shooting, Petitioner and Rodriguez retrieved their belongings and fled. Nearly four years later, Petitioner was arrested in Caracas, Venezuela.

On June 25, 1997, the United States requested that Petitioner be extradited, pursuant to the extradition treaty between the United States and Venezuela. The treaty authorizes extradition of fugitives for crimes of murder and other enumerated offenses, and provides that Venezuela may "decline to grant extradition for crimes punishable by death and life imprisonment" unless it receives "satisfactory assurances that in the case of conviction the death penalty or imprisonment for life will not be inflicted." *See* Treaty, and Additional Article, Between the United States and Venezuela for Extradition of Fugitives

from Justice, 1924 WL 23796, 43 Stat. 1698, Arts. II & IV (Jan. 2, 1924).

The Ministry of Foreign Affairs of the Republic of Venezuela sought assurances from the United States Embassy that Benitez would not be sentenced to death, and on November 4, 1997, the United States certified that a death sentence would not be imposed. (CT 54.) The United States further informed the Ministry that the California sentencing guideline penalty for conviction of first-degree murder would be a sentence of 25-years-to-life, with additional terms of three, four, or five years if the allegation of using a gun was proven. (*Id.*) The United States also described California's sentencing guidelines regarding parole and lesser charges. (*Id.*) The Ministry was advised that Benitez would receive a "minimum mandatory prison term of 19 years, 2 months" if convicted of first degree murder, or less if convicted of a lesser degree of murder, and that he "would have a right to a parole request" after serving a minimum mandatory term. (*Id.*)

On February 27, 1998, the Attorney General of Venezuela noted the United States's assurances and summarized Petitioner's potential punishment, as follows:

> [T]he legal punishment corresponding to the crime attributed to the accused might be capital punishment, ... life imprisonment without the possibility of preparatory freedom ..., or imprisonment ... for a term of 25 years to life ....[¶] Considering the above, we can see that there appears on the record ... that, if extradited, ... BENITEZ shall

cussion the recommendation in the Report, in which Petitioner's claim of instructional error was denied. *See U.S. v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003) ("the district judge must review the magistrate judge's findings and recommendations de novo *if objection is made,* but not otherwise.") (emphasis in original). *See also Thomas v. Arn,* 474 U.S.

140, 149–52, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) ("It does not appear that Congress intended to require district court review of a magistrate[judge's] factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.").

not be sentenced to death. [¶] It is also expressed that if he is sentenced for ·murdér in the first degree, he shall receive prison from twenty five (25) years to life imprisonment, with an additional increase from 3, 4 or 5 years, if it is proven the allegation that he used a fire weapon. If he received the maximum sentence, he shall be entitled to make a request for parole, after having served the minimum mandatory term in prison of nineteen (19) years and two (2) months. [¶] *Considering this situation, it has been fully determined that capital punishment shall not be applied in any case, and, in principle, not even life imprisonment.*[2]

(CT 75–76) (emphasis added).

The diplomatic exchange reveals Venezuela had, at least prior to Petitioner's extradition, satisfied itself Petitioner would not be subject to punishment proscribed by the treaty, that is, death or "imprisonment for life," as that term is used in the treaty. The Attorney Generally specifically noted Petitioner could "make a request for parole" and thus, "in principle, not even life imprisonment" would be imposed. (CT 75–76.)

Thereafter, on June 4, 1998, Venezuela's Supreme Court of Justice issued a decree that granted Petitioner's extradition, but with an added provision that Petitioner was not to receive "punishment depriving his freedom for more than thirty years, pursuant to the rules [found in the Constitution of Venezuela and the Criminal Code]."[3] (CT 88.) The record reveals no assurances were requested by Venezuela regarding the decree or its thirty year sentencing limitation, and none were provided by the United States.

On August 17, 1998, the Venezuelan Ministry of Foreign Affairs notified the United States Embassy of the extradition decree. (CT 60.) The notice provided that, "Said extradition is conditioned to the understanding that [Benitez] will not be sentenced to death or life in prison or incarceration for more than thirty (30) years ...." (*Id.*) Petitioner was extradited from Venezuela by a San Diego Police Sergeant and a United States Marshal on August 28, 1998. (CT 119.)

On July 16, 1999, over ten months after Petitioner's extradition, and after receiving information from Petitioner's California criminal defense counsel immediately before commencement of trial, the Venezuelan Embassy sent a letter to the United States Department of Justice, voicing its concerns regarding the "features" of an indeterminate sentence of twenty-five-years-to-life. (CT 116.) The Embassy expressed its unease with the potential violation of the extradition treaty, "as well as the conditions established in the sentence of the Supreme Court of Venezuela which approved the extradition request presented by the Government of the United States." (*Id.*) Based upon the exchange between Petitioner's trial counsel and the Venezuelan Embassy, it appears the Embassy was concerned that an indeterminate sentence (if Petitioner was repeatedly denied parole) might run afoul of the treaty's ban on imprisonment for life or the thirty

---

**2.** The quoted language is contained in an official translation. All subsequent quotations attributable to the Venezuelan government also are contained in an official translation.

**3.** The extradition decree, which incorporates the Attorney General's summary regarding California's indeterminate sentencing law and life imprisonment (CT 75–76), holds, in pertinent part: "[T]his Supreme Court of Justice, ... GRANTS THE EXTRADITION of ... BENITEZ ... such extradition being subject to the fact that the referred citizen shall not be imposed a penalty involving death penalty [sic] or life imprisonment or punishment depriving his freedom for more than thirty years ...." (CT 88.)

year sentencing cap referenced in the extradition decree.

At trial, defense counsel initially moved for dismissal based on the trial court's lack of jurisdiction, arguing the United States had violated the provisions of the extradition treaty by not clarifying to Venezuela that Petitioner "was in fact subject to actually serving a life sentence" in the event he was not paroled. (CT 42.) Counsel further argued there was no "meeting of the minds" between the United States and Venezuela because Venezuela extradited Petitioner "under the mistaken belief he would *not* be subject to more than thirty years in prison." (*Id.*) (emphasis in original). In response, the district attorney argued nothing in the treaty precluded Petitioner from being tried in a country that had a possible indeterminate sentence. (RT 24.) The trial court denied the motion and found that Petitioner could be tried for murder because he had been represented by counsel in Venezuela, the United States did not commit fraud in the request for extradition, and Venezuela extradited him with knowledge of California's sentencing guidelines. (RT 27–29.) After a jury trial, Petitioner was convicted of second-degree murder. (CT 196.)

On August 30, 1999 (the day before Petitioner's sentencing hearing), the District Attorney's office received a letter from the United States Department of State, recommending that Petitioner not serve a life sentence. (Lodg.1, Ex. 5.) However, the letter further clarified: "We do not believe the Office of the District Attorney is required to make such a recommendation, as

the United States was explicit regarding the assurances it provided the Government of Venezuela, which only encompassed the death penalty." (*Id.*)[4] The District Attorney did not submit the letter into evidence, and the trial court was not aware of the letter at the sentencing hearing. (Lodg. 7, at 5–6.)

Benitez was eventually sentenced to an indeterminate term of 15–years–to–life on the murder charge, with an additional four years for the use of a gun, for a total term of 19–years–to–life. (Lodg. 7, at 6.) Defense counsel subsequently argued that Petitioner's prison term should be an indeterminate term with a cap of thirty years, and requested that Petitioner be released after thirty years. However, the trial court declined the request, finding the issue of Petitioner's release after thirty years was not yet ripe for review. The court indicated that it was not aware of any authority giving it the power to fashion an alternative remedy other than the sentence mandated by California law, and further indicated that even were this power to exist, the court would not have changed the sentence in Petitioner's case. (*Id.*)

The state appellate court upheld Petitioner's conviction, based on a direct interpretation of the language of the extradition treaty between the United States and Venezuela. (Lodg.7.) According to the court, the treaty only provides that, in the case of conviction, Petitioner would not be subject to the death penalty or life imprisonment; however, the treaty did not define "impris-

4. The United States Department of State further advised in the letter: "In July 1999, over ten months after the extradition, the Government of Venezuela formally advised the United States that in its view Mr. Rodriguez Benitez should not receive the death penalty *or* a life sentence. Although the express terms of the U.S.-Venezuela treaty would have allowed Venezuela to seek this additional assurance

prior to the extradition, it did not do so, and extradited Mr. Rodriguez Benitez based solely on the death penalty assurance. However, we note that Venezuela has in the past typically sought both kinds of assurances in light of the fact that the Venezuelan constitution prohibits life imprisonment as well as the death penalty." (Lodg.1, Ex. 5) (emphasis in original).

onment for life," did not mention the thirty year sentence cap, and did not expressly incorporate the Constitution of Venezuela. Furthermore, the treaty did not define "satisfactory assurances," nor require the requesting state (here, the United States) to ensure the assurances given are satisfactory to the requested state (here, Venezuela). (*Id.* at 10.)

Consequently, the appellate court found that: (1) prior to Petitioner's extradition, the United States Embassy had only assured Venezuela that Petitioner would not receive the death penalty and explained California sentencing guidelines; (2) Venezuela extradited Petitioner without requesting assurances that Petitioner would not receive an indeterminate sentence; and (3) the United States Embassy and the San Diego District Attorney's Office did not misrepresent California's sentencing guidelines or assure Venezuela that Petitioner would not receive an indeterminate sentence. (Lodg. 7, at 10–11.) Because Venezuela did not seek additional assurances with regard to potential sentencing, and Petitioner was extradited, convicted, and sentenced according to the guidelines presented to Venezuela prior to the extradition, the appellate court found that the trial court did not err when it concluded no violation of the extradition treaty occurred and allowed Petitioner to stand trial. The court of appeal denied the Petitioner's appeal on October 11, 2000.

The California Supreme Court denied review on December 20, 2000. Petitioner then filed this habeas petition on March 14, 2002.

## II.

## DISCUSSION

The Court reviews a Magistrate Judge's Report and Recommendation, if objected to, de novo. *See Hunt v. Pliler*, 336 F.3d 839, 844 (9th Cir.2003) (quoting *McKeever*

*v. Block*, 932 F.2d 795, 798 (9th Cir.1991)). As discussed below, the Petition is DENIED in its entirety.

### A. AEDPA Standard of Review

Because Petitioner filed his habeas corpus petition after the effective date of the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), the Court's review is limited by the provisions set forth in 28 U.S.C. § 2254(d). Under this Section, a habeas petitioner is not entitled to relief unless he can demonstrate that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)—(2).

As the facts of the case are not in dispute, Petitioner is entitled to federal habeas relief only if he can meet one of the two bases for relief provided in Section 2254(d)(1). *Price v. Vincent*, 538 U.S. 634, 639–40, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003). According to the Supreme Court, Section 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," and "demands that state court decisions be given the benefit of the doubt." *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.2003) (citing *Lindh v. Murphy*, 521 U.S. 320, 333, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)). The Supreme Court in *Middleton v. McNeil*, 541 U.S. 433, 124 S.Ct. 1830, 1832–33, 158 L.Ed.2d 701 (2004), recently reemphasized the deferential standard of review imposed by AEDPA when it reversed the Ninth Circuit

Court of Appeals' grant of a habeas petition for "fail[ing] to give appropriate deference to the state court's decision."

■■■ In *Williams v. Taylor*, the Supreme Court clarified the terms "contrary to" and "unreasonable application of" under Section 2254(d)(1).[5] 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is *"contrary to"* clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. *Id.* at 405, 120 S.Ct. 1495 (emphasis added). On the other hand, "a state court's decision involves an *'unreasonable application of'* federal law if it either (1) correctly identifies the correct governing legal rule but then applies it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Id.* at 407, 120 S.Ct. 1495 (emphasis added). Each of these definitions—"contrary to" and "unreasonable application of" of clearly established federal law—applies in the analysis of this case.

■■ The Supreme Court has repeatedly emphasized that "an unreasonable application of federal law is different from an incorrect application of federal law." *Clark,* 331 F.3d at 1067 (citing *Williams,* 529 U.S. at 410, 120 S.Ct. 1495); *Penry v. Johnson,* 532 U.S. 782, 793, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) ("Even if the federal habeas court concludes that the state court

decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable."); *Woodford,* 537 U.S. at 24, 123 S.Ct. 357 (a federal court may not "substitute its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."). Thus, a "federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411, 120 S.Ct. 1495. Rather, the application must be objectively unreasonable. *Yarborough v. Alvarado,* 541 U.S. 652, 669, 124 S.Ct. 2140, 2152, 158 L.Ed.2d 938 (2004).

■■ To determine what constitutes "clearly established federal law," the Supreme Court stated in *Williams* that the statutory phrase "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision," and that the source of clearly established law is restricted to the Supreme Court's jurisprudence. *Williams,* 529 U.S. at 412, 120 S.Ct. 1495. Therefore, although federal circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of federal law, *only* Supreme Court holdings are binding on the state courts and *only* those holdings need be reasonably applied. *See Clark,* 331 F.3d at 1069 (citing *Duhaime v. Ducharme,* 200 F.3d 597, 600–01 (9th Cir.1999)); *Shaw v. Terhune,* 353 F.3d 697, 702 (9th Cir.2003) ("in the context of a

5. *"Williams* resulted in a highly fractured decision by the Supreme Court in which only specific parts of the lead opinion by Justice Stevens were adopted by a majority of the Court. However, Part II of Justice O'Connor's concurrence was joined by Chief Justice Rehnquist and Justices Kennedy, Thomas and Scalia, thus making it the opinion of the

Court for matters discussed in it. Part II of Justice O'Connor's concurrence addresses the proper interpretation of 28 U.S.C. § 2254(d)(1)." *Alvarado v. Hickman,* 316 F.3d 841, 851 (9th. Cir.2002) (internal citations omitted), *rev'd sub nom. on other grounds, Yarborough v. Alvarado,* 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

habeas petition interpreted under the auspices of AEDPA, a Ninth Circuit decision without supporting Supreme Court precedent is not binding.") (citation omitted).

In reviewing a state court judgment under AEDPA, this Court is instructed to examine "the state court's last reasoned decision." *Benn v. Lambert,* 283 F.3d 1040, 1052 n. 7 (9th Cir.2002). Accordingly, the focus of review here is on the state appellate decision.

## B. *The Indeterminate Sentence and the Terms of the Extradition Treaty*

Petitioner asserts his indeterminate sentence of 19–years–to–life violates clearly established federal law because it contravenes the terms of his extradition from Venezuela. The extradition treaty provides:

> In view of the abolition of capital punishment and of imprisonment for life by Constitutional provision in Venezuela, the Contracting Parties reserve the right to decline to grant extradition for crimes punishable by death and life imprisonment. Nevertheless, the Executive Authority of each of the Contracting Parties shall have the power to grant extradition for such crimes upon the receipt of satisfactory assurances that in case of conviction the death penalty or imprisonment for life will not be inflicted.

United States–Venezuela Extradition Treaty, 1924 WL 23796, 43 Stat. 1698, Art. IV.

The extradition treaty thus instructs only that the death penalty and life imprisonment will not be imposed on an extradited prisoner. However, the extradition *decree* issued by the Venezuelan Supreme Court contained an additional provision, that Petitioner could not receive imprisonment for more than thirty years. Consequently, Petitioner argues that his indeterminate sentence contravenes both the treaty and the additional provision of the extradition decree because it *could result* in life imprisonment or, if not life, then a term of confinement exceeding thirty years.

Therefore, Petitioner contends he is entitled to habeas relief. To prevail on his claim, Petitioner must demonstrate that the state court's rejection of his indeterminate sentence as a violation of the extradition treaty was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

### 1. *Report of Magistrate Judge*

The Report found that the state trial and appellate courts had erred by *not* taking into account the additional sentencing restriction imposed by the Venezuelan Supreme Court in the extradition decree. (Report at 17–20.) According to the Report, "judicial decrees granting extradition requests may specify enforceable terms and conditions beyond the letter of the treaty language"; therefore, the extradition decree should have been interpreted as part of the extradition treaty signed into effect by the United States and Venezuela. (*Id.* at 13.) The Report then concludes that state courts must not only observe extradition treaties, but they also must adhere to the provisions of those treaties in criminal proceedings because state courts are bound by international treaties under the Supremacy Clause of the United States Constitution. (*Id.* at 9.)

The Report further holds that the specialty doctrine required the state court to give effect to the thirty year sentence limitation provided in the extradition decree. (*Id.* at 19.) Under the doctrine of specialty, "a person who has been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offenses

described in that treaty, and for the offense with which he is charged in the proceedings for his extradition." *United States v. Rauscher,* 119 U.S. 407, 430, 7 S.Ct. 234, 30 L.Ed. 425 (1886).

Although *Rauscher* and subsequent Supreme Court decisions have applied the doctrine of specialty only to *offenses,* the Report cites Second Circuit decisions and the Restatement of Foreign Relations Law to support its conclusion that the specialty doctrine should be equally applicable to *punishment.* (Report at 11–15, citing *U.S. v. Casamento,* 887 F.2d 1141, 1185 (2nd Cir.1989); *U.S. v. Campbell,* 300 F.3d 202 (2nd Cir.2002); Restatement (Third) Foreign Relations Law of the United States, § 477, cmt. (b) (1987).)

Nonetheless, the Report ultimately concludes that despite the state courts' error, Petitioner's treaty violation claim should be denied without prejudice because Petitioner is not *presently* incarcerated in violation of his rights under the Constitution, federal law, the extradition treaty, or even the extradition decree. (Report at 20.) According to the Report, Petitioner's right to seek federal habeas relief will "accrue," if at all, when he has served a full thirty year prison term and is not immediately released. (*Id.*)

### 2. Analysis

Under AEDPA, when ruling on a Petition for Writ of Habeas Corpus, the key inquiry is not whether the state court "erred." In *Lockyer v. Andrade,* the Supreme Court did "not reach the question whether the state court erred" in deciding whether habeas relief should be granted, but rather focused "solely on whether § 2254(d) forecloses habeas relief." 538 U.S. 63, 71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). In doing so, the Supreme Court overruled the Ninth Circuit's previous requirement that federal habeas courts review the state court decision *de novo*

before applying the AEDPA standard of review, and expressly held that the only question that matters under Section 2254(d)(1) is whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law. *Id.*

In determining in this case whether the state court's refusal to give effect to the sentencing limitation of the extradition decree is contrary to, or an unreasonable application of, clearly established federal law, the Court first addresses whether Petitioner's indeterminate sentence violates the treaty *itself* without regard to the decree. For reasons discussed below, the Court concludes the decision of the state court upholding the indeterminate sentence as not violative of the treaty's prohibition against life imprisonment is not contrary to clearly established federal law. This discussion leads inevitably to the central issue; that is, whether the state court's refusal to give effect to the thirty year sentencing limitation imposed by the *decree* is contrary to clearly established federal law. It is not, for reasons which shall be explained further below. Finally, the Court concludes habeas relief is not available for the state court's failure to extend the specialty doctrine to Petitioner's punishment because its failure to do so is not objectively unreasonable.

### a. The Treaty

■ The extradition treaty with Venezuela forbids capital punishment and imprisonment for life. It further provides that Venezuela may nevertheless extradite a fugitive if it receives "satisfactory assurances" that death or imprisonment for life will not be imposed. Therefore, where assurances *are* made that death or life imprisonment will not be imposed, the requesting party may not impose such a

sentence as it would violate the express terms of the treaty.[6]

Here, however, it is undisputed the United States Embassy did not provide assurances that a life sentence would not be imposed. Rather, it disclosed California's sentencing guidelines for first degree murder, *i.e.*, a 25–years–*to–life* sentence with the possibility of parole. With this knowledge, the Government of Venezuela did not request further assurances regarding life imprisonment or California's indeterminate sentencing law before it extradited Petitioner.

Petitioner nonetheless contends the United States violated the treaty by not clarifying the ramifications of an indeterminate sentence, *i.e.*, that Petitioner "was in fact subject to actually serving a life sentence." (CT 42.) This contention was rejected by the state appellate court. The state court's reasoning is set forth in detail in light of its thorough consideration of this issue:

> The treaty does not define imprisonment for life, it does not state the maximum sentence that may be imposed on an extradited individual is 30 years, nor does it expressly incorporate the Constitution of Venezuela. What the treaty does provide is authority to grant extradition for crimes punishable by death and life imprisonment upon receipt of 'satisfactory assurances' that the death penalty or imprisonment for life will not be inflicted. *The treaty does not define 'satisfactory assurances,' nor does it require the country requesting extradition to ensure that assurances given are satisfactory to the extraditing country.*
>
> Here, before Benitez's extradition, the United States Embassy assured Venezuela he would not receive the death penalty and explained California sentencing guidelines. Venezuela did not request assurances that Benitez would not receive an indeterminate life sentence. The United States Embassy and the San Diego District Attorney's Office did not misrepresent the California sentencing guidelines and never assured the Venezuelan government that Benitez would not receive a life sentence. Based upon the information provided to them, the Venezuelan government extradited Benitez without seeking additional assurances to potential sentencing. Benitez was extradited and eventually convicted and sentenced according to the guidelines presented to Venezuela before the extradition took place. For these reasons, the trial court did not err.

(Lodg. 7, at 10–11) (emphasis added).

The Supreme Court has not defined the term "satisfactory assurances," let alone the requesting state's obligations under a treaty, if any, once a requested state (here Venezuela) raises concerns months after extradition about a potential punishment over which it did not request assurances. The paucity of Supreme Court authority on the issue serves as a limitation on this Court's review of the matter. *See Penry*, 532 U.S. at 795, 121 S.Ct. 1910. Given the state court's considered analysis of the language of the treaty and the undisputed diplomatic exchange between the embassies—which indicates no assurances were provided regarding a life sentence—the state court did not act contrary to clearly established federal law when it found Petitioner was not entitled to relief on his claim the treaty was violated.

**b. *The Decree***

■ Petitioner also complains that his indeterminate sentence violates the "no

---

6. The Supreme Court caselaw has clearly established that the terms of a treaty are controlling and must be followed by the states.

*See Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888).

more than thirty years" condition of the extradition decree because his request for parole might not be granted until after he has been confined for more than thirty years. Petitioner contends there was "no meeting of the minds" and, therefore, he was extradited in violation of the treaty. (CT 42.) This contention assumes the decree is on equal footing with the treaty and thus, is binding on the state courts.

The Supreme Court, however, has never held that an extradition *decree* may specify enforceable terms and conditions beyond the terms of the treaty itself. As a matter of policy, extradition *treaties,* being ratified on the "Advice and Consent of the Senate," are themselves deemed federal law, on equal footing with other democratically enacted federal statutes as "the supreme Law of the Land" pursuant to the Supremacy Clause. *See* U.S. Const., art II, § 2, cl. 2 (the President "shall have the Power, by and with the Advice and Consent of the Senate to make Treaties"); *id.,* art. VI, cl. 2 ("This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land."). *See also Whitney,* 124 U.S. at 194, 8 S.Ct. 456; *Rauscher,* 119 U.S. at 419, 7 S.Ct. 234 ("A treaty . . . is a law of the land, as an Act of Congress is . . . ."). Accordingly, under the Supremacy Clause, the terms of a treaty are the supreme law of the land.

On the other hand, an extradition decree is simply a pronouncement of a foreign court. Such decrees ordinarily follow a diplomatic exchange between embassies and reflect the assurances provided by the requesting state. Under such circumstances, that is, when a decree reflects the assurances provided by the requesting state, the limitations contained in the decree have been held by courts in the Second Circuit to be binding on the requesting state. *See Campbell,* 300 F.3d at 202. The Supreme Court, however, has not addressed this issue.

In *Campbell,* the Second Circuit Court of Appeals held that where the extradition decree conditioned extradition on a sentence not to exceed fifty years, and "[i]n response to that condition" the United States Department of State (as well as the federal district court) agreed to the limitation, the decree was binding on the district court. 300 F.3d at 211. Here, in contrast, the United States did not respond to the extradition decree, nor was it requested to do so. It also did not provide assurances concerning a thirty year maximum term or life imprisonment, nor was it requested to do so. In addition, upon request, the United States did disclose California's indeterminate sentencing rules regarding crimes of murder, and did provide assurances to Venezuela regarding all matters specifically requested, *i.e.,* the death penalty.

The holding of *Campbell* is therefore not applicable to this case because assurances regarding a thirty year maximum term were neither requested nor provided.[7] The subject decree, in effect, was a one-

---

7. The Second Circuit issued a similar decision in *Casamento,* 887 F.2d at 1141. There, the court—as in *Campbell*—held the sentence imposed by the district judge was limited by the extradition order (which contained a thirty year maximum). 887 F.2d at 1185. The *Casamento* court, however, did not set forth the facts surrounding the extradition. If the extradition order was issued following assurances given by the United States, *i.e.,* a prom-

ise not to impose a sentence in excess of thirty years, then its holding is similar to that of *Campbell* and inapplicable to this case for the reasons set forth above. If, on the other hand, *Casamento* is argued for the proposition that a unilaterally issued extradition decree is binding on the requesting state, it still does not provide Petitioner habeas relief because the Supreme Court has never accorded an extradition decree such force and effect.

sided pronouncement by the Venezuelan Supreme Court. The California appellate court did not contravene federal law when it gave no credence to the decree under these unique circumstances.

Moreover, even if this Court were to assume that Petitioner's extradition decree was the product of assurances provided by the United States, Petitioner still would not be entitled to relief because federal law is not clearly established in this area. There is no Supreme Court authority extending the same degree of deference afforded a treaty to the conditions contained in an extradition decree of a foreign court (regardless of whether the decree is issued unilaterally, only after satisfactory assurances are received, or under a misapprehension as to the terms of extradition). If the federal law is not clearly established at the time of the state court determination, § 2254(d)(1) bars relief. *Williams*, 529 U.S. at 412, 120 S.Ct. 1495. The state court, therefore, did not act in contravention of clearly established federal law.

### c. *Failure to Extend the Specialty Doctrine to Punishment*

 In upholding Petitioner's indeterminate prison term, the state appellate court implicitly refused to extend the specialty doctrine to address Petitioner's sentence. The specialty doctrine has long stood for "the proposition that the requesting state, which secures the surrender of a person, can prosecute that person only for the *offense* for which he was surrendered by the requested state or else the requesting state must obtain the consent of the surrendering state before proceeding on other charges." M. Cherif Bassiouni, *International Extradition: United States Law & Practice* § 6.1, at 511 (4th ed.2002)(emphasis added). The doctrine is of French derivation and is broadly recognized in international law and practice. *Id.* at 512. It is based on principles of comity between independent sovereigns, and is designed to ensure against a "requesting state's breach of trust" and to "avoid prosecutorial abuse." *Id.* at 515.

The United States recognizes the specialty doctrine through its jurisprudence, treaty practice, and national legislation. Bassiouni, *supra*, § 6.1, at 512. The Supreme Court incorporated the doctrine into American law in 1886 by its decision in *United States v. Rauscher*, 119 U.S. at 407, 7 S.Ct. 234.[8] *See* Bassiouni, *supra*, § 6.1, at 511—17. Following *Rauscher*, many treaties—including the present one—were drafted to specifically incorporate the specialty doctrine. The United States also adopted the doctrine in 18 U.S.C. § 3186 ("The Secretary of State may order the person committed ... to be delivered to any authorized agent of such foreign government, to be tried for the *offense* of which charged.") (emphasis added). The doctrine has thus been entrenched in American law.

To date, however, the Supreme Court has addressed only whether an extradited fugitive may raise a challenge when the *offense* for which he was extradited was not the offense for which he was actually tried, convicted and sentenced. *See*

---

**8.** In *Rauscher*, the Court applied the doctrine of specialty even though the treaty at issue did *not* contain a provision precluding prosecution for a crime for which extradition was not granted. The Court nevertheless adopted the doctrine after analyzing the practices of other nations and the writings of commentators. It acknowledged that, "according to the doctrine of publicists and writers on international law, the country receiving the offender against its laws from another country had no right to proceed against him for any other offence than that for which he had been delivered up." 119 U.S. at 419, 7 S.Ct. 234. The doctrine, therefore, has a basis *independent* of treaties (although many treaties specifically incorporate the doctrine).

*Rauscher,* 119 U.S. at 430, 7 S.Ct. 234; *Johnson v. Browne,* 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907) (similar). It has not gone so far as to hold that an extradited fugitive may challenge his sentence under this doctrine when the actual term of confinement varies from that expressly contemplated by the requested state. The history of the specialty doctrine, including its adoption in American jurisprudence, legislation and treaties, indicates a consistent application of the doctrine only to offenses, not punishment.

In upholding Petitioner's indeterminate sentence in this case, the state court implicitly declined to extend the specialty doctrine to the *punishment* received by Petitioner. On habeas review, this Court must therefore determine whether the failure to extend a clearly established legal principle (the speciality doctrine) was objectively unreasonable. *See Williams,* 529 U.S. at 407, 120 S.Ct. 1495 (state court decision involves an "unreasonable application" of federal law if it "fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable.").

Apparently, the only authority expressly to support an extension of the specialty

doctrine to punishment is, as referenced in the Report, the Restatement of Foreign Relations Law of the United States.[9] The other authorities referenced in the Report, two cases from the Second Circuit, implicitly extend the doctrine to punishment.[10]

In the present case, the state court properly focused on the lack of assurances requested by Venezuela regarding an indeterminate sentence or a thirty year maximum term. In negotiating Petitioner's extradition, the United States government provided a clear overview of California's sentencing scheme, specifically the guidelines for first-degree murder. As recognized by the state appellate court, Venezuela did not request any assurances that Benitez would not receive an indeterminate sentence, although it would have been able to do so under the express terms of the treaty.

In addition, the specialty doctrine is specifically incorporated into the subject treaty with Venezuela—and it applies only to offenses, not punishment. *See* Treaty, *supra,* 1924 WL 23796, Art. XIV ("No person shall be tried for any *crime or offense* other than that for which he was surrendered.") (emphasis added). As noted previously, the specialty doctrine is based on

**9.** The Restatement (Third) of Foreign Relations Law § 477 (1987) provides that a person who has been extradited "will not, unless the requested state consents, (a) be tried by the requesting state for an offense other than one for which he was extradited; or (b) be given punishment more severe than was provided by the applicable law of the requesting state at the time of the request for extradition." Comment B of § 477 further states the specialty doctrine "is designed ... to prevent punishment in excess of what the requested state had reason to believe was contemplated."

**10.** In *Casamento,* 887 F.2d at 1141, on direct appeal from the lower court, the court entertained—without analysis of the specialty doctrine—appellant's contention he was punished

in violation of the extradition order. Similarly, in *Campbell,* 300 F.3d at 202, the court entertained appellant's challenge on direct appeal that he had been sentenced in violation of the extradition decree, but did so without discussing the specialty doctrine.

Because both of these cases were postured on direct appeal (and not habeas review), the Second Circuit had no occasion to apply AEDPA's deferential standard of review, and was therefore not required to analyze the objective reasonableness of extending the specialty doctrine beyond offenses. 28 U.S.C. § 2254(d)(1); *Alvarado,* 316 F.3d at 852 (AEDPA's "unreasonable application" prong may be violated where the state court "fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable.").

comity between independent sovereigns. Comity would not require a court of either nation here to extend the specialty doctrine beyond the boundaries of which the two governments had negotiated and codified in the resultant treaty. The failure of the state court to extend the specialty doctrine to Petitioner's sentence was therefore not objectively unreasonable, and habeas relief is not warranted.[11]

### d. *Summary*

For these reasons, Petitioner's indeterminate sentence does not violate the specific terms of the extradition treaty with Venezuela and, therefore, the state court's decision is not contrary to clearly established federal law. Further, there is no controlling Supreme Court authority that would afford an extradition decree the same force and effect as an extradition treaty. Thus, the state court's adjudication was not contrary to clearly established federal law. Finally, the failure to extend the specialty doctrine to the punishment received by Petitioner was not objectively unreasonable.

### III.

### CONCLUSION AND ORDER

Based on the foregoing, the Court adopts-in-part the Report and Recommendation of the Magistrate Judge to Deny the Petition. The Petition for Writ of Habeas Corpus is **DENIED**. The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

---

11. "The word 'extend' does not appear in AEDPA." *Hawkins v. Alabama*, 318 F.3d 1302, 1307 n. 3 (11th Cir.2003). Thus, in determining whether a state court's *failure to extend* was an "unreasonable application of" federal law, a habeas court must be mindful not to require the state court to apply a new rule under the guise of a reasonable extension to an existing rule. *See Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938, 2004 WL 1190042, at *10. In this respect, the failure to extend the (clearly established) speciality doctrine to punishments may instead be viewed as the rejection of a new rule (which has not been "clearly established" by Supreme Court precedent). In *Al-*

*varado*, the Supreme Court noted that "[t]here is some force to this argument." *Id.* "The state courts cannot narrow the Supreme Court's legal rules, but state courts are not obliged to widen the rules. Whatever AEDPA is or was intended to be, ADEPA is no Congressional command for activism in the state courts." *Hawkins*, 318 F.3d at 1307 n. 3. Nonetheless, whether deemed a reasonable determination not to extend the specialty doctrine to punishment, or failure to apply a new rule which has not been clearly established by Supreme Court precedent, AEDPA does not allow habeas relief for Petitioner's indeterminate sentence.