

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-75,896

### EX PARTE SHELTON DENORIA JONES, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 596,207-B IN THE 248TH JUDICIAL DISTRICT COURT
### HARRIS  COUNTY

**HOLCOMB, J., filed a dissenting opinion, in which PRICE, J., joined.**

In November 1991, a Harris County jury found applicant guilty of capital murder.  At the punishment stage of the trial, applicant offered the testimony of eleven witnesses in mitigation of punishment.  That testimony, if believed, and reasonable inferences therefrom, established the following about applicant's character and record: (1) Applicant's biological father abandoned him at birth and had no further contact with him.  (2) Applicant was separated from his mother and left in the care of his grandmother for much of the time before he was eight years old.  (3) Applicant has a rare type of "empty vessel personality [in which his] moral convictions . . . change from one

situation to the next depending on who he's with and who is influencing him at the time."[1]  (4)

_____

[1]  Dr. Jerome Brown, a clinical psychologist, testified as follows:

Q: As a result of [your] testing [of applicant] and as a result of your evaluation [of him], were you able to make a determination as to what type of personality [he] has?

A: I have, I believe, a good deal of information about the kind of personality traits that he exhibits, the kind of overall personality, in terms of a label.  The only thing I can say about that is he really does not fit into any known mental disorder that we know about.  He does exhibit a certain personality type, in my opinion, that is fairly rare, that I've only seen a few times in the twenty or so years I have done this work.

Q: What type of personality?  Do you have a name for that type of personality?

A: Well, again, it's not listed in any type of nomenclature that I know about, but my expression for it is kind of the empty vessel personality, in that a person's moral structures, this person's moral convictions, are very fluid, and they basically change from one situation to the next depending on who he's with and who is influencing him at the time.
        So, you don't get the picture, for example, of a strong personality, you don't get the picture of an aggressive personality.  You get the picture of someone who is relatively bland, as a matter of fact, and kind of vacuous, in terms of his personality traits.

*    *    *

Q: This type of empty vessel personality, are you telling me that the personality is shaped by the strongest influence that's available to him?

A: Pretty much that's true.

*    *    *

Q: Would this type of individual . . . function exceedingly well inside of a prison?

A: [T]hey typically have model prisoner records.

*    *    *

(continued...)

Applicant, while in high school, earned average and above-average grades and good conduct marks, had good classroom attendance, and had a good reputation. (5) Applicant was generally well-behaved as a child and as a young adult.[2] (6) Applicant had an excellent work ethic and employment history, and was generally known to be kind, peaceable, helpful, and dependable. (7) While in the Harris County Jail awaiting trial, a period which lasted eight months, applicant was a model prisoner.

At the close of the punishment stage, the trial court, in accordance with the statutory law in effect at the time, directed the jury to answer two special issues:

> (1) "Was the conduct of the defendant, Shelton Denoria Jones, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?"
>
> (2) "Is there a probability that the defendant, Shelton Denoria Jones, would commit criminal acts of violence that would constitute a continuing threat to society?"
>
> Accompanying the two special issues were the following instructions:
>
> "The burden of proof in this phase of the trial still rests upon the State and never shifts to the defendant. Each Special Issue submitted must be proved by the State beyond a reasonable doubt; therefore, before any issue may be answered 'Yes,' all jurors must be convinced by the evidence beyond a reasonable doubt that the answer to such issue should be 'Yes.'
>
> \* \* \*
>
> "You are further instructed that if any juror, after considering the evidence and these instructions, has a reasonable doubt as to whether the answer to a Special

---

[1](...continued)
Q: And if he was approached [in prison] and fell in with a group or was indoctrinated, so to speak, by a group, even in a prison he could be a killing machine?

A: If he were selected and aggressively pursued to become a member of, for example, like a prison gang or something, some of the more extreme elements in the prison setting, then he would be vulnerable and susceptible to that kind of influence.

[2] The record reflects that applicant was around 22 years old at the time of his offense.

Issue should be answered 'Yes,' then such juror should vote 'No' to the Special Issue in the jury's deliberations.

\* \* \*

"If ten (10) or more vote 'no' as to any Special Issue, and only if ten (10) jurors or more vote 'no,' then the answer of the jury shall be 'No' to that issue.

\* \* \*

"You are further instructed that if the jury returns an affirmative finding on each of the issues submitted, this Court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted, the Court shall sentence the defendant to confinement in the Texas Department of Criminal Justice, Institutional Division, for life.

\* \* \*

"You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability, at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, then a negative finding should be given to one of the special issues."[3]

The jury subsequently answered both special issues in the affirmative, and the trial court assessed applicant's punishment at death.

In his habeas brief to this Court, applicant argues:

"At the punishment phase of [the] trial, the jury heard testimony about relevant mitigating circumstances that included expert testimony regarding [applicant's] psychological impairment revealing [his] susceptibility to influence and tending to reduce his personal culpability. The jury likewise heard testimony regarding [applicant's] troubled childhood, including his abandonment by his biological father and separation from his biological mother at an early age.

\* \* \*

"The former special issues as modified by the nullification instruction failed to permit [applicant's] capital sentencing jury to fully consider and give effect to [his]

---

[3] This last paragraph is of the type now known as a "nullification instruction."

constitutionally relevant mitigating evidence, including evidence of psychological impairment through an expert witness and [applicant's] abandonment by his biological father and separation from his mother at an early age."

\* \* \*

"[A] reasonable juror could conclude from the expert testimony that the aberrational anti-social conduct that culminated in the instant offense was caused less by [applicant's] own will and initiative than by the influences of consistently stronger anti-social personalities in his environment since having graduated [from] high school. A fact-finder could reasonably have deemed evidence of [applicant's] psychological impairment to have reduced his moral culpability and to have mitigating value.

\* \* \*

"[T]he expert testimony offered during the punishment phase of [applicant's] trial regarding his psychological profile had some relevance to the special issues the jury answered, but it had relevance to [applicant's] moral culpability . . . beyond the scope of the . . . special issues.

\* \* \*

"[Even with the nullification instruction, applicant's] jury [was left] without an adequate vehicle to express its reasoned moral response to [his] mitigating evidence of his psychological impairment [and] abandonment by his biological father and separation from his mother.

\* \* \*

"[S]uch evidence may serve as a basis for mercy even if a jury decides that the murder was committed deliberately and that the defendant posed a continuing threat.

\* \* \*

"Additionally, the nullification instruction injected capriciousness into the proceeding, in violation of the Eighth and Fourteenth Amendment principles requiring that death sentences not be imposed in an arbitrary and capricious manner." (Some punctuation omitted.)

The Eighth Amendment's prohibition of "cruel and unusual punishments" was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666 (1962). A sentence of death is cruel, within the meaning of the Eighth Amendment, when it is inflicted despite the existence of factors that, according to contemporary moral standards, reasonably warrant a sentence less than death. *Woodson v. North Carolina*, 428 U.S. 280, 303-304 (1976). Accordingly, capital sentencers must be allowed to consider and give

meaningful effect to proffered mitigating evidence regarding the defendant's character and record and the circumstances of the offense; otherwise, there is an unacceptable risk that an unwarranted, cruel death sentence will be imposed. *Lockett v. Ohio*, 438 U.S. 586, 605-606 (1978). In this context, "mitigating evidence" means any evidence that a sentencer could reasonably find warrants a sentence less than death. *Tennard v. Dretke*, 542 U.S. 274, 284-285 (2004). If the sentencer is given an adequate vehicle for expressing its reasoned moral response to the defendant's mitigating evidence, then and only then can we be sure that the sentencer has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence. *Penry v. Johnson*, 532 U.S. 782, 797 (2001).

Was applicant's proffered evidence constitutionally mitigating? Yes, it was. As the majority concedes, applicant's evidence met the low threshold standard set out in *Tennard*. A juror could reasonably find that applicant's proffered mitigating evidence warranted a sentence less than death.

Was applicant's jury given an adequate vehicle for expressing its reasoned moral response to his mitigating evidence? No, it was not. First, applicant's mitigating evidence of his troubled childhood had no relevance to the statutory special issues on "deliberateness" and "future dangerousness." Second, applicant's mitigating evidence of his "empty vessel" personality, although relevant to the statutory special issue on "future dangerousness,"[4] was also relevant to his moral culpability beyond the scope of that special issue. As applicant points out in his brief, his jury could have believed that he posed a future danger, in part because of his psychological impairment, and yet it also could have believed that his psychological impairment warranted a sentence less than

---

[4] Interestingly, applicant's jury could have reasonably interpreted the evidence of his rare personality type to mean either that he would be a future danger or that he would not be a future danger. *See* footnote one and accompanying text.

death. Third, although the nullification instruction was intended to make up for the deficiencies in the two statutory special issues, the mechanism it purported to create for the jurors to give effect to applicant's mitigating evidence was ineffective and illogical.

The nullification instruction in this case suffered from the same infirmities as did the one in *Penry v. Johnson*, 532 U.S. 782. That is, there are two possible ways the jurors could have understood this confusing instruction. The jurors could have understood the instruction as telling them to take applicant's mitigating evidence into account in determining truthful answers to each of the special issues. Viewed in that way, however, the nullification instruction would have been ineffective, because neither of the special issues was broad enough to provide a vehicle for the jurors to give full mitigating effect to applicant's evidence of his troubled childhood and his rare personality type. Alternatively, the jurors could have understood the instruction as telling them that they could simply answer one of the special issues "no" if they believed that applicant's mitigating evidence made a life sentence appropriate. Understood in that way, however, the instruction made the jury charge as a whole internally contradictory, because elsewhere in the charge the jurors were told that a "no" answer to a special issue was appropriate only when ten or more of them had a reasonable doubt as to whether the evidence supported a "yes" answer to that special issue. Indeed, if the jurors understood the nullification instruction as telling them to answer one of the special issues falsely if they concluded that mitigating circumstances warranted a life sentence, then the nullification instruction invited them to violate their oath to render a true verdict.

The nullification instruction in this case inserted capriciousness and uncertainty into the jurors' sentencing decision, and made their power to avoid the death penalty possibly dependent on their willingness to violate their oath. There is, at the very least, a reasonable likelihood that the

jurors applied their instructions in a way that prevented their full consideration of applicant's mitigating evidence.

I respectfully dissent. I would remand the case for a new punishment hearing.

DELIVERED JUNE 10, 2009

DO NOT PUBLISH