Artie JACKSON, Plaintiff/Petitioner

v.

Larry NORRIS, Director, Arkansas Department of Correction, Defendant/Respondent.

No. 4:08–CV–03319 GTE–JTK.

United States District Court, E.D. Arkansas, Western Division.

July 20, 2010.

Order Granting Stay and Order of Release Aug. 25, 2010.

Jeffrey M. Rosenzweig, Attorney at Law, Little Rock, AR, for Plaintiff/Petitioner.

Lauren Elizabeth Heil, Arkansas Attorney General's Office, Little Rock, AR, for Defendant/Respondent.

## MEMORANDUM OPINION

GARNETT THOMAS EISELE, District Judge.

Before the Court is a petition for a writ of habeas corpus filed by Petitioner Artie Jackson pursuant to 28 U.S.C. § 2254.

The Court has carefully reviewed the entire file in this matter, including the Proposed Findings and Recommendations prepared by Magistrate Jerome Kearney, Petitioner's objections thereto, and Respondent Larry Norris's response to Petitioner's objections. The Court also heard oral argument from counsel, at a hearing held on June 23, 2010. For the reasons stated herein, the Court concludes the writ should be granted.

## I. Background

On May 3, 2006, a Pulaski County Circuit Court jury convicted Petitioner Jackson of first-degree sexual abuse and second-degree sexual assault of a minor child. Petitioner was sentenced to ten years' imprisonment and twenty years' probation. Petitioner timely appealed his conviction to the Arkansas Supreme Court, which affirmed the conviction and rejected all of Petitioner's constitutional arguments. See *Jackson v. State*, 368 Ark. 610, 614–15, 249 S.W.3d 127, 130 (2007).[1]

The alleged victim was Petitioner Jackson's step-granddaughter, J.W. Petitioner Jackson is married to J.W.'s maternal grandmother. Jackson was convicted solely on the basis of J.W.'s testimony that Jackson initiated inappropriate sexual contact with her on more than ten occasions. At trial, J.W. testified that Jackson touched her vagina, made her touch his penis, and performed oral sex on her. She testified this happened "a lot" which she quantified as "more than 10 times."

At the time of the trial, J.W. was 15 years old. She testified that the alleged sexual contact occurred when she was between 7 and 12 years old. J.W. was at the Jackson household either because she was

living there, with her mother, or because she was staying there for adult supervision while her mother worked.

J.W. first made allegations against Jackson when she was 14 years old, in December of 2004. The allegations surfaced during a conversation between J.W. and her mother, Regina Barnes, in Barnes' automobile. As part of his defense, Jackson sought, unsuccessfully, to present evidence regarding the circumstances, content, and context of this conversation in which J.W. first made the allegations against him.

Barnes testified that she confronted her daughter after learning that her daughter had possibly had a sexual encounter with a young man. In response to her mother's questioning, J.W. admitted having consensual sex with a teenage boy named Nigel. After learning that the encounter occurred at Nigel's house, J.W.'s mother asked her how she was able to get transportation to the boy's house. J.W. responded that "Paw–Paw" (referring to Jackson) had taken her there. According to J.W., this upset her mother, who at some point began crying. A fair inference by the jury would have been that J.W.'s mother concluded, and J.W. permitted her to conclude, that Jackson took J.W. to the boy's house knowing that she was going there for a sexual encounter. Jackson acknowledged taking J.W. to the boy's house, but disclaimed any knowledge that the visit was for a sexual purpose, believing that he was simply taking her to a friend's house for a visit.

After her mother expressed shock and disbelief that Jackson would provide the necessary transportation, J.W. told her mother that Jackson "did a lot of things that y'all don't know about"[2] and then

---

1. Petitioner Jackson's petition for certiorari was denied by the United States Supreme Court on October 1, 2007. *Jackson v. Arkansas*, 552 U.S. 850, 128 S.Ct. 112, 169 L.Ed.2d 79 (2007).

2. Respondent's Exhibit A (filed under seal), docket entry # 8 (hereinafter referred to as Respondent's Exhibit A), at Vol. III, p. 12.

proceeded to make the allegations leading to the criminal charges.

Jackson contends that J.W., noting her mother's emotional reaction to her revelation that Jackson transported her to the boy's house, immediately saw an opportunity to deflect blame from herself onto Jackson, which she promptly did with embellishment. He contends that she did this first by blaming Jackson for taking her to the boy's house, insinuating that Jackson knew the true purpose for the visit. It is undisputed that this made J.W.'s mother angry with Jackson. J.W. then alleged, for the first time, that Jackson had inappropriately touched her years earlier.

At trial, Jackson attempted unsuccessfully to present evidence concerning the context and circumstances in which J.W. first accused him of inappropriate sexual conduct. Because such evidence inextricably involved the prior sexual conduct of the victim, it triggered the possible application of Arkansas's Rape Shield Statute, Ark. Code Ann. § 16–42–101. Jackson argues that the evidence fell within the statutory exception permitting victim sexual conduct evidence if such evidence is determined to be relevant to a fact in issue and its probative value outweighs any inflammatory or prejudicial nature. Ark.Code Ann. § 16–42–101(c)(2)(C).

As required by the statute, an *in-camera* hearing was held on January 30, 2006. J.W. and her mother both testified during the hearing. Following their testimony, Jackson's counsel argued that it was essential to the defense that Jackson be permitted to put on evidence of the entire conversation in the car to demonstrate how the allegations against him came to be made and to show the victim's potential motive or bias in making the allegations.

In the pre-trial *in-camera* hearing to determine whether the evidence could be admitted, J.W. downplayed her mother's reaction to her disclosure, but she later acknowledged, during a proffer made at trial, that her mother was disappointed in her for having sex with Nigel and that she made the allegations against Jackson immediately after her mother had expressed her disappointment to J.W.[3]

On February 22, 2006, in a one paragraph letter, the state trial judge summarily denied Jackson's request, finding that "the evidence sought to be admitted is not admissible pursuant to Ark.Code Ann. Sec. 16–42–101."[4] Petitioner then renewed his motion to admit evidence of prior sexual conduct, noting that the trial court had not ruled on his claims that the denial of the motion would also infringe upon his federal and state constitutional rights to present a defense, defined to include his rights to due process, fair trial, compulsory process and confrontation under the Sixth and Fourteenth Amendments to the United States Constitution.[5] On March 1, 2006, in another one paragraph letter, the state trial judge rejected Jackson's argument that exclusion of the evidence would infringe upon his federal and state constitutional rights.[6]

Only three witnesses testified at trial. The State called two witnesses, J.W. and her mother. Jackson testified in his own defense. No physical evidence was presented; no witness provided corroborating testimony. The jury's resolution of the case necessarily involved weighing the credibility of J.W. and Jackson to determine who was telling the truth.

---

3. Respondent's Exhibit A at Vol. I, p. 130–131.

4. Respondent's Exhibit A at Vol. I, p. 23.

5. *Id.* at 24–25.

6. *Id.* at 26.

## II. Standard

When the state court has ruled on the merits of a petitioner's claims, a writ of habeas corpus may not be granted unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1), (2). The United States Supreme Court has provided the following guidance on the proper interpretation of the statutory standard:

> A state court decision will be "contrary to" our clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."
>
> ... Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable.

*Penry v. Johnson,* 532 U.S. 782, 792–93, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (citations omitted).

■ Even if the Court concludes that an error rising to the statutory threshold occurred, relief is not automatically required. The Court must first conduct the harmless error review established in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). "Under *Brecht,* habeas relief is proper only if the error had 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Toua Hong Chang v. Minnesota,* 521 F.3d 828 (8th Cir.2008) (quoting *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710).

## III. Discussion

Jackson's Petition raises only one issue. He contends that the Arkansas Rape Shield Statute as interpreted by the Arkansas Supreme Court was applied in a manner that violated his constitutional right to present a defense. For the reasons discussed below, the Court agrees.

### A. Application of the Arkansas Rape Shield Statute

■ The Arkansas Supreme Court concluded that the proffered evidence "lacked any relevance to the question of [Petitioner's] guilt." *Jackson,* 368 Ark. at 614, 249 S.W.3d 127. Brushing aside Petitioner's argument that he needed to tender the evidence to explain the victim's alleged motive to fabricate the charge, the court framed the issue in terms of "the fact that J.W. had sexual intercourse with a boy her own age," which it concluded was "not related to whether [Petitioner] engaged in inappropriate sexual behavior with the minor victim." *Id.* at 615, 249 S.W.3d 127. This conclusion missed the point of the evidence completely.

When considering the relevance of the information, it is not the *fact* that the victim had sexual intercourse with a boy her own age that was relevant, but rather the fact that she first accused Petitioner of sexual misconduct immediately after revealing to her mother that she had been sexually active, a revelation which upset her mother. In this emotionally charged conversation, Petitioner accused Jackson of the criminal acts leading to his conviction. Petitioner was not attempting to use

this evidence as part of a general character assault on J.W., but, rather, to show that J.W. had a motive to shift her mother's emotional reaction from J.W. to Jackson. The true relevance of the information was not considered by the Arkansas Supreme Court.

Moreover, how J.W. came to accuse Jackson was, arguably, part and parcel of the story itself. The jury was told that J.W. waited two years after the last alleged instance of abuse before coming forward. It was then told, without explanation, that she simply revealed in a conversation with her mother that Jackson had abused her years earlier. What motivated J.W. to accuse Jackson after years of silence was not, as suggested, irrelevant. The evidence, if admitted, would have permitted Jackson to attack J.W.'s credibility and to explore a possible motivation to falsely accuse him.

Without such evidence, Jackson resorted to speculating as to other reasons that J.W. might have made up the story. For instance, Jackson's counsel elicited testimony that she was bored at her grandparent's house and disliked doing chores.

■ The Court disagrees that this was an adequate substitute for the more obvious defense that Jackson desired to present.[7] The Arkansas Supreme Court's rejection of Jackson's constitutional argument based on its conclusion that Jackson was permitted to present a defense, just not the defense he wanted, is clearly contrary to well established United States Supreme Court precedent. When there is an evidentiary basis for questioning the key prosecution witness's motivation to testify, constitutional principles come into play.

Magistrate Judge Kearney also agreed with the Arkansas Supreme Court that the excluded evidence had minimal, if any, probative value. He pointed to the fact that during the pre-trial in camera hearing both J.W. and her mother testified that Barnes was not angry with J.W. and that there was no threat by Barnes or concern by J.W. about J.W. being punished for having sex with the boy. This is certainly how the prosecution argued the testimony should have been interpreted by the trier of fact, but this was not the only interpretation, or necessarily even the most reasonable interpretation, that a jury might make if the whole unedited mother-daugh-

---

7. Note the Arkansas Supreme Court's language in dealing with this issue:

> Appellant claims that he was denied the ability to present evidence of the context in which the allegations were made and thus was unable to adduce significant evidence of J.W.'s true motive. He concludes that this was a clear violation of his constitutional right to present a defense. However, during the trial, Appellant elicited testimony from J.W. as to another possible motive for accusing Appellant, specifically, that she was bored at her grandparents' house. Thus, it was not that Appellant was not allowed to present a defense, but rather that he was not allowed to present the defense he wanted due to the exclusion of J.W.'s prior sexual conduct. As the exclusion was proper under section 16–42–101(b) [exclusionary portion of the rape

> shield statute], the trial court did not err in finding that the exclusion did not violate Appellant's constitutional rights.

*Jackson*, 368 Ark. at 615, 249 S.W.3d at 130.
This last sentence suggests, incorrectly, that evidence excluded because it falls within the purview of Arkansas's rape shield statute could never violate a criminal defendant's federal constitutional rights. The comment ignores 16–42–101(c) which establishes a process by which otherwise excludable evidence may still be admitted when the probative value of such evidence is found to outweigh its inflammatory or prejudicial nature. This exception, which is arguably necessary to make Arkansas's rape shield statute constitutional on its face, provides a basis for trial courts to consider whether the admission of such evidence is constitutionally compelled.

ter conversation had been before it. J.W.'s description of the conversation was such that a reasonable fact finder could construe it as emotionally charged. During her proffer at trial, J.W. acknowledged that her mother was upset and told her that she was disappointed in her. Disputes over how the evidence could be interpreted and whether it would have affected an assessment of J.W.'s credibility should have been left for the jury to decide.

The State suggested during oral argument that even if the evidence was relevant, defense counsel could have presented the same defense without referencing J.W.'s consensual sexual encounter and is at fault for failing to do so. Relying on *Boysiewick v. Schriro,* 179 F.3d 616 (8th Cir.1999), the State argues that Jackson could have presented the critical element of the defense theory, that J.W. accused him to avoid punishment for her own misconduct, without revealing the details of her own misconduct, thereby avoiding any mention of J.W.'s sexual relationship with Nigel.

The Court rejects this argument. First, the characterization of the evidence is too narrow. Jackson sought to put before the jury the circumstances in which J.W., came to accuse him years after the alleged abuse occurred. Those circumstances provided a basis for Jackson to contend that J.W. fabricated her accusations against Jackson to avoid feared punishment[8] for, or her mother's negative reaction to, J.W.'s consensual sexual encounter. Further, Jackson could have argued that J.W. used him to minimize her mother's immediate reaction to her disclosure, first by shifting the focus from J.W.'s conduct to Jackson's conduct by suggesting that Jackson had purposefully taken her to Nigel's house to have sex (which Jackson denies), and then, seeing her mother's anger at Jackson, by contending that Jackson, years earlier, had molested her. To avoid describing the sexual predicate of J.W.'s conduct clearly creates an artificial construct of the entire conversation.

Second, and more importantly, defense counsel was justified in construing the trial court's ruling as placing the entire conversation off limits. Under the terms of Arkansas's Rape Shield statute, if the trial court determines that the offered proof is relevant to any fact in issue and admissible, its obligation is to issue a written order "stating what evidence, if any, may be introduced by the defendant and the nature of the questions to be permitted in accordance with the applicable rules of evidence." Ark.Code Ann. § 16–42–101(c)(2)(C). Following the *in camera* hearing, the trial court took the issue under advisement, with Jackson's counsel reminding the judge that a written order was required. The court then ruled that "the evidence sought to be admitted is not admissible."[9]

Defense counsel was subject to sanctions if he willfully attempted to "make any reference to the evidence prohibited." *Id.* at 16–42–101(d). In reviewing the transcript, it is clear that defense counsel did as much as he reasonably could to present the evidence excluded, repeatedly advising the trial court that such evidence was critical to his defense, all to no avail.

---

**8.** The evidence does not become irrelevant, as suggested, because Barnes, J.W.'s mother, testified that she did not intend to punish her daughter for her conduct, nor because J.W., after-the-fact, claimed she was not afraid of punishment. The point was that Barnes in real time reacted negatively and emotionally to the disclosure and immediately communicated her disappointment to J.W.

**9.** Respondent's Exhibit at Vol. I, p. 23.

■ Of course, the fact that the evidence was relevant does not mean that it was admissible. Under the Arkansas Rape Shield Statute, relevant victim sexual conduct evidence is admitted only if "its probative value outweighs its inflammatory or prejudicial nature." Ark.Code Ann. § 16–42–101(c)(2)(C). By deciding that the evidence was simply not relevant, the Arkansas Supreme Court avoided this analysis.

In the Court's view, the probative value of this evidence outweighed any inflammatory or prejudicial nature and should have been admitted. The fact that J.W., on a single occasion, had consensual sex with a boyfriend near her own age is neither inflammatory nor particularly prejudicial in nature. The sexual conduct evidence consisted of a single consensual sexual encounter with a peer. To repeat it would not have required J.W. to relive an incident of abuse. Nor did it involve inquiry into embarrassing details of a sexual encounter. While J.W. would certainly prefer not to discuss the incident in open court, the protection provided to her under the rape shield statute must be balanced against Jackson's constitutional right to confront his accuser and to present a defense.

The fact that this Court would have admitted the evidence under the rape shield statute does not mean that Jackson is entitled to habeas relief. Such relief is available only if the error violated Jackson's rights under the United States Constitution.

## B. Jackson's Constitutional Rights Were Violated

■ The right of criminal defendants to present relevant testimony is a "fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). This right has generally included the right to examine a witness's motive to fabricate.

*Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam). As stated by the Supreme Court, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Id.* at 231, 109 S.Ct. 480 (omitting citations and internal quotations).

In *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court reversed the defendant's state burglary and grand larceny conviction, finding that the defendant's right of effective cross-examination had been violated when he was prohibited from cross-examining the prosecution's key witness regarding his probation status. The witness, a juvenile, identified the defendant as the man he saw with a crowbar near his home, close to the site where a stolen safe was later discovered, having been pried open. The defendant wanted to introduce evidence that the juvenile witness was on probation for burglary, not for general impeachment purposes, but, rather, to support his theory that the witness feared being blamed for the crime and to show his possible bias and motive in accusing the defendant. *Davis*, 415 U.S. at 311, 94 S.Ct. 1105. The trial court excluded the evidence based on an Alaska statute and procedural rule prohibiting the admission of evidence of a juvenile disposition.

■ "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316, 94 S.Ct. 1105. A criminal defendant's ability to expose "a witness' motivation in testifying is a proper and important function of the constitution-

ally protected right of cross-examination." *Id.* at 316–17, 94 S.Ct. 1105.

 Rape shield statutes and juvenile-record protection rules are similar in that both are intended to exclude information to protect the privacy rights of the individuals they are intended to protect. The law is well established that state statutes restricting evidence to protect the privacy rights of individuals must be balanced so as not to unduly interfere with a defendant's ability to defend himself against criminal charges. This Court concludes that the "temporary embarrassment" to J.W. by the disclosure that she had sex with a peer is "outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness." *Davis,* 415 U.S. at 319, 94 S.Ct. 1105.

Here, we are not dealing only with the testimony of a "crucial identification witness." Rather, in this case J.W.'s testimony provided the only basis to support the factual allegations giving rise to the crimes charged against Jackson.

 The evidence excluded was relevant to the issue of J.W.'s motive to lie, and its exclusion impaired Jackson's ability to present a full and fair defense. Without this evidence, Jackson was left with resorting to attacking the victim's motive by arguing that she was bored when she stayed at his home and also did not like following the rules of the Jackson household. The Court can not agree with the Arkansas Supreme Court's conclusion that this provided a meaningful and sufficient defense. The constitutional right to present a defense is not satisfied simply because some defense, any defense, is presented. Jackson was denied the right to tell the uncensored story of how the allegations against him arose, the circumstances of which supported his true defense, that his victim made up the story to

transfer her mother's disappointment or anger with her, to Jackson.

It is not for this Court to "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it." *Davis,* 415 U.S. at 317, 94 S.Ct. 1105. The State's case rested solely on the truthfulness of J.W.'s testimony. The defense should have been permitted to develop the evidence regarding the circumstances in which the allegations first surfaced against him. Such evidence would have permitted him to argue that J.W. had a motive to, and did, fabricate the charges against him.

 Arkansas's rape shield law serves an important purpose. It protects the rights of victims of sexual abuse from unnecessary humiliation and invasion of privacy. Worthy as those goals are, they must be balanced against, and must sometimes yield to, the constitutional right of a criminal defendant to adequately cross-examine his accuser and to put on a defense.

The Court concludes that the state court decision unreasonably applied clearly established federal law.

### C. The Constitutional Error Was Not Harmless

On the proper application of the *Brecht* harmless-error analysis, the Eighth Circuit has instructed:

> A "substantial and injurious effect" occurs when the court finds itself in "grave doubt" about the effect of the error on the jury's verdict. "Grave doubt" exists where the issue of harmlessness is "so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error."

*Toua Hong Chang,* 521 F.3d at 832 (omitting citations).

 To consider whether the evidentiary error in this case rises to the level of

*Brecht* error, the following factors are important: "(1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of the evidence corroboration or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case." *Id.* at 832–833.

 In this case, the key issue was whether the sexual contact between Jackson and the victim ever occurred. The victim said it happened. Jackson denied it. There was no physical evidence. The prosecution's case consisted solely of the victim's word that the sexual contact occurred, between 3 and 8 years before the trial. The defendant was not permitted to elicit the details of how the allegations were first made, which arguably provided the victim with a motive to make up the allegations against him.

Compounding the prejudice to Jackson was the prosecution's argument regarding the lack of victim motive evidence. During the closing argument, the prosecutor argued to the jury:

> Now, then you heard from Paw Paw, from the Defendant. What did he say? It didn't happen. What did the Defense attorney say at the beginning of the trial? This is a lie. That [J.W.] made this all up, and now she's having to deal with it and repeat the lie time and again.

Ladies and gentleman, what incentive does a 15 year old girl have to make this up?[10] Then, in the State's rebuttal, the prosecutor argued:

> [J.W.] came in here, and she told you what happened. [J.W.] is an eye witness. . . . She didn't have any reason to come in here and tell you a lie, ladies and gentleman. . . .

What the Defense is trying to float out there is she didn't like these rules. She was bored, didn't want to go over there. What child of that age wouldn't be bored at certain times? Does that make any sense why a year and a half later she'd tell her mom about what this man had done to her because she was bored when she went over there? She didn't want to go over there anymore. Well, guess what, she wasn't having to go over there anymore. She hadn't been over there but maybe two or three times—[11]

In both instances, Petitioner's counsel moved for a mistrial or an admonition. In both instances, the trial court denied both requests.

Had Jackson been permitted to present the excluded evidence, he could have argued that J.W. was motivated to accuse him in order to deflect her mother's initial adverse emotional reaction against her onto Jackson, and then, seeing her mother's reaction, ran with it. And, after her mother went to the prosecuting authorities, she was stuck with the story. At least, that is how Jackson wanted to defend himself. And, there was clearly an evidentiary basis for the argument the defense sought to present. The evidence was excluded with little, if any, concern over the impact on Jackson's constitutional rights.

The Court does not know whether this evidence, if admitted, would have been enough to make the jury believe Jackson or to create reasonable doubt in the minds of the jury. It does, however, find itself in a state of "virtual equipoise" as to whether the exclusion of such evidence had an effect on the verdict. For that reason, the Court can not find that the constitutional error in this case was harmless.

**10.** Respondent's Exhibit A at Vol. I, p. 194.

**11.** *Id.* at 209.

## IV. Conclusion

For the reasons herein stated,

IT IS HEREBY ORDERED THAT Petitioner Artie Jackson's § 2254 petition for writ of habeas corpus be, and it is hereby, GRANTED. Because his constitutional right to present a defense was violated, his state convictions are hereby set aside. The State may retry Jackson on the charges at its election, but must do so within 120 days of the entry of this Opinion. A Judgment and Decree so ordering will be entered separately.

IT IS FURTHER ORDERED THAT the Recommendation of Magistrate Judge Kearney to dismiss the Petition for Writ of Habeas Corpus (docket entry #13) be, and it is hereby, DENIED.[12]

### ORDER

Before the Court are two motions related to the pending appeal of this Court's Memorandum Opinion and Judgment filed July 20, 2010,[1] granting a writ of habeas corpus to Petitioner Artie Jackson. Respondent Ray Hobbs, Director of the Arkansas Department of Correction (hereinafter referred to as "ADC") has filed a Motion to Stay this Court's ruling pending appeal. Petitioner Artie Jackson has filed a Motion for Release pending appeal. During a telephone conference on August 23, 2010, the Court discussed the motions with the parties and requested additional information.[2] Yesterday, on August 24, 2010, the parties filed a stipulation addressing the Court's inquiries.[3]

After carefully considering the issues presented, the Court grants both motions. The Court's Judgment will be stayed, but Jackson will be released pending the outcome of the appeal.

### A. Stay While on Appeal

■ The factors for issuance of a stay are:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.[4]

■ The Court finds that its Judgment should be stayed. Weighing heavily in favor of a stay is the fact that it is in the public interest for the appellate courts to be heard on the important constitutional issues presented in this case. This Court views the case as illustrating a serious flaw in Arkansas's criminal justice system, whereby Arkansas applies its rape shield statute in a broad and sweeping fashion without properly focusing on the constitutional rights of the accused. While this Court does not share the ADC's assessment that it has a strong likelihood of success on appeal, it does recognize the possibility that a higher court may reach a different conclusion. It further recognizes and respects the State of Arkansas's right to, and interest in, appellate review. Without a stay, Arkansas authorities likely

---

**12.** The Court thanks Judge Kearney for his careful analysis of the issues. We simply disagree on this difficult case.

**1.** Docket entries #19 #20. The Notice of Appeal, docket entry #24, was filed on August 18, 2010.

**2.** The discussion during the telephone conference was transcribed by Court Reporter Kar-

en Baker. The Court's statements made therein are hereby incorporated by reference in this Order.

**3.** Docket entry #33.

**4.** *Hilton v. Braunskill,* 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987).

will be required to decide whether to retry Jackson before the appellate determination is complete. Further, by directing Jackson's release pending appeal, as discussed in more detail below, injury to Jackson will be minimized even though a stay is granted. After considering all four factors, the Court concludes that this resolution strikes the appropriate balance in protecting the rights and interests of all interested parties.

## B. Release Pending Appeal

The Court views the issue of whether a stay should be granted independently from the issue of whether Jackson should be released pending appeal. The parties agree that *Hilton v. Braunskill*, supra,[5] is the leading Supreme Court case on point. The Court quoted extensively from the *Braunskill* case during the telephone conference.

The presumption is that Jackson should be released pending the appeal. Federal Rule of Appellate Procedure 23(c) provides:

(c) Release Pending Review of Decision Ordering Release. While a decision ordering the release of a prisoner is under review, the prisoner must— unless the court or judge rendering the decision, or the court of appeal, or the Supreme Court, or a judge or justice of either court orders otherwise—be release on personal recognizance, with or without surety.

As the Supreme Court made clear in *Braunskill*, when considering a successful habeas prisoner's release pending appeal a court may consider the traditional four factors regulating the issuance of a stay in addition to the language of Rule 23(c). "Since the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules."[6]

Numerous factors support Jackson's release. Jackson has no criminal history, other than the convictions in this case, which this Court has found should be set aside. During the state court proceedings, Jackson was permitted to remain free on bond before trial and also pending his state appeal. The parties agree he remained free without incident. Counsel for the ADC acknowledged during the telephone conference that she knows of no facts suggesting that Jackson, if released, will pose a flight risk. She further acknowledged that she has no factual basis, other than the convictions at issue, for arguing that Jackson poses a danger to the community. If released, Jackson will reside with his sister. He is divorced from the victim's grand-mother. As a further condition of his release (and as agreed to by his counsel during the telephone conference), Jackson must have no contact with the alleged victim or her family.

Finally, the Court notes that Jackson became eligible for parole on July 22, 2009. Jackson's counsel contends that Jackson remains in prison because he denies his guilt. The Arkansas Parole Board has implemented a policy requiring completion of the Reducing Sexual Violence Program ("RSVP") before granting parole.[7] Successful completion of the RSVP requires the participant to acknowledge that there is a victim of the offense. Thus, Jackson's denial of guilt renders him unable to complete the RSVP and keeps him in prison,[8]

---

5. 481 U.S. 770, 107 S.Ct. 2113.

6. *Braunskill,* 481 U.S. at 777, 107 S.Ct. 2113.

7. Arkansas law requires the Parole Board to consider "the work skills, education, rehabilitation, and treatment programs recommended to the inmate upon intake and deter-

mine whether the inmate took advantage of those opportunities while incarcerated in the department in making decisions regarding parole." Ark.Code Ann. § 12–28–104.

8. The Court is not called upon to assess the legitimacy of the Parole Board's requirement.

even though he might otherwise have been paroled by this time.[9] Unless the Parole Board changes its policy or Jackson completes the RSVP, the parties agree he is likely to remain in custody until November 6, 2017.

■ "The State's interest in continuing custody and rehabilitation pending a final determination of the case on appeal is also a factor to be considered; it will be strongest where the remaining portion of the sentence to be served is long, and weakest where there is little of the sentence remaining to be served."[10] ADC's counsel argued during the telephone conference that the Court should view Jackson as having over 7 years left to serve of his 10 year sentence, which weighs in favor of continued custody. The ADC is not arguing that custody is necessary for rehabilitation. In fact, Jackson is apparently not eligible for rehabilitation (or parole) solely because he denies his guilt. Rather, it appears that the ADC simply wants to continue to keep Jackson in prison. Such desire is not alone sufficient to overcome Rule 23(c)'s presumption of release.

Finally, Jackson's denial of guilt in prison is consistent with his denial of guilt at trial. As the Court has observed previously, Jackson was convicted based solely on the victim's testimony, but denied the opportunity to explore her motive to fabricate the charges or to adequately confront her on cross-examination. Of course, this Court can not say whether Jackson is innocent or predict whether, if given a fair trial, he may be convicted. It can say, however, that justice is not served by requiring him to remain incarcerated until he is either given a fair trial or this Court's ruling is reversed.

### C. Conclusion

For the reasons herein stated,

IT IS THEREFORE ORDERED THAT the Motion for Stay filed by Respondent Ray Hobbs, Director of the Arkansas Department of Correction (docket entry # 22) be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED THAT Petitioner Artie Jackson's Motion for Order of Release (docket entry # 30) be, and it is hereby, GRANTED. Pursuant to Rule 23(c) of the Federal Rules of Appellate Procedure, the Arkansas Department of Corrections is hereby directed to release Petitioner Artie Jackson forthwith and to permit him to remain free on a personal recognizance bond, without surety. State authorities may elect to impose conditions on his release consistent with any defendant free on release pending appeal.

To implement the rulings of this Order, the Court proposes to enter the proposed Amended Judgment attached to this Order as Exhibit A. If either party has any objection to the terms of the proposed Amended Judgment, they shall promptly make their objection known.

The brief delay in entry of the Amended Judgment shall not be cause for delay in directing the immediate release of Petitioner Artie Jackson.

### *EXHIBIT A*

### *PROPOSED AMENDED AND SUBSTITUTED JUDGMENT*

This Judgment is entered in substitution for this Court's original Judgment[1] which

---

**9.** It is unclear whether Jackson would, in fact, already have been paroled if he had completed the RSVP.

**10.** *Braunskill*, 481 U.S. at 777, 107 S.Ct. 2113.

**1.** Doc. No. 20.

is hereby VACATED. For the reasons stated in the Memorandum Opinion entered on July 20, 2010 and the Order entered on August 25, 2010,

IT IS HEREBY CONSIDERED, ORDERED, AND ADJUDGED THAT Petitioner Artie Jackson's § 2254 petition for writ of habeas corpus be, and it is hereby, GRANTED. His state convictions are hereby set aside.

Pending review of this Court's ruling, Petitioner Jackson shall be released from custody on a personal recognizance bond based on Fed. R.App. P. 23(c).

If this Court's ruling to set aside the convictions is affirmed, the State of Arkansas shall take the steps necessary to expunge the convictions from the record. Additionally, the State of Arkansas may, at its election, retry Jackson but only if trial proceedings are commenced not later than 90 days after the date the appeal proceedings become final.

If this Court's ruling is overruled and the convictions are reinstated, the State of Arkansas shall promptly advise Jackson when and where he shall report to continue serving his criminal sentence.